650 So.2d 712 (1994)
Christi VEAZEY
v.
ELMWOOD PLANTATION ASSOCIATES, LTD. and Southmark Management Corporation.
No. 93-C-2818.
Supreme Court of Louisiana.
November 30, 1994.
Rehearing Denied March 24, 1995.
Opinions Concurring in Denial of Rehearing filed March 24, 1995.
*713 Wanda T. Anderson-Tate, Metairie, for applicant.
Jacob J. Amato, Jr., Lisa A. Dunn, Amato & Creely, Gretna, for respondent.
Lawrence S. Kullman, New Orleans, J.J. McKernan, Baton Rouge, for amicus curiae La. Trial Lawyers Ass'n.

FACTS AND PROCEDURAL HISTORY
KIMBALL, Justice.[*]
In June, 1988, Christi Veazey leased an apartment in the Elmwood Plantation Apartments complex in Metairie, Louisiana, from Tonti Management Corporation ("Tonti"). About two weeks later, the complex was sold and Southmark Management Corporation ("Southmark") assumed management of the complex. At approximately 1:45 a.m., on October 3, 1988, an intruder entered plaintiff's second-story apartment through her bedroom window and raped her. Plaintiff was unable to identify the rapist, and the rapist's identity remains unknown.
In November, 1988, Christi Veazey commenced the instant action in negligence against Southmark. Plaintiff's allegations regarding Southmark's negligence can be grouped into two categories: (1) misrepresenting the amount of security at the complex and the number of past criminal acts occurring on the complex premises, and (2) furnishing inadequate security. As to the misrepresentations, plaintiff alleged that management represented to her and to her mother that Jefferson Parish Sheriff's Office deputies lived on the premises and provided security and that, with the exception of a burglary that occurred a few years earlier, no criminal offenses had been reported to management as having been committed on the complex premises. The truth, plaintiff alleged, was the security officers were only convenience officers who had no responsibility for protecting the residents, and management was aware that other rapes or attempted rapes had been committed on the complex premises over the past year. As to the inadequacy of security, plaintiff alleged that Southmark failed to provide adequate locks on the windows, failed to maintain the premises so as to discourage potential intruders, and failed to provide adequate lighting. With regard to the latter, plaintiff further alleged that she had complained to management about the lighting in general, and about the non-functioning pool lights, in particular.
Southmark answered plaintiff's complaint generally denying all of plaintiff's allegations. Southmark also filed a third-party demand against Tonti, who had leased the apartment to plaintiff. Tonti responded by filing a motion for summary judgment. While the trial court denied Tonti's motion, the court of appeal granted writs, finding that Tonti was entitled to summary judgment. Tonti was thus dismissed from the suit, and the case proceeded to trial solely against Southmark. At the close of the four-day jury trial, Southmark requested, pursuant to La.Code Civ. Pro. art. 1812(C)(2),[1] that the trial court submit *714 a special interrogatory so as to permit the allocation of fault to the nonparty rapist. The trial court denied Southmark's request as well as its motion for a continuance to seek emergency writs on the issue.
The jury returned a verdict itemizing plaintiff's damages as follows: $150,000 in general damages and $30,000 in special damages, for a total damage award of $180,000. The jury, however, returned an inconsistent verdict on liability. Specifically, the jury responded to interrogatory # 1 that defendant Southmark was at fault, to interrogatory # 2 that plaintiff Christi Veazey was free from fault, and to interrogatory # 3 that Southmark was 60% at fault and plaintiff was 40% at fault.[2] The trial court, nonetheless, entered judgment adopting the verdict of the jury as the judgment of the court, assessing 40% fault to plaintiff and 60% fault to defendant. Plaintiff filed a motion for clarification and, in the alternative, motions for a judgment notwithstanding the verdict ("JNOV") and new trial. The trial court granted both the motions for clarification and JNOV, reallocating all of the fault to Southmark and finding it liable for the entire $180,000 damage award.
Affirming, the court of appeal found that while the trial court's granting of the motion for clarification was improper, its granting of the JNOV was proper. Veazey v. Elmwood Plantation Associates, Ltd. and Southmark Management Corp., 625 So.2d 675 (La.App. 5th Cir.1993). No error exists, the court of appeal reasoned, simply because the judgment was styled a clarification and a JNOV, as in substance "the judgment [took] on the legal posture of a JNOV and nothing more." Id. at 681. The court of appeal further reasoned that because "the record [was] devoid of any facts that would support finding Christi Veazey at fault for her own rape," the granting of the JNOV, which reallocated all of the fault to Southmark, was not manifestly erroneous. Id. at 680-81.
The court of appeal also found no reversible error in the trial court's refusal to submit a special interrogatory to the jury for allocation of fault to the nonparty rapist. In support of its finding, the court of appeal cited the following two rationales: (1) the wide discretion La.Code Civ.Pro. art. 1812 affords the trial court in determining whether to submit such an interrogatory; and (2) the jurisprudential "mandates" that denying a requested jury charge is reversible error only if it results in the jury being misled to such an extent as to prevent it from doing justice. Applying both rationales, the court of appeal concluded that "after careful review, we can only say the trial court did not commit reversible error because of the wide discretion granted by our statutory scheme, and, more importantly, we conclude the trial court's action did not cause the jury to be misled to such an extent as to prevent it from doing justice." Id. at 679. In reaching that result, however, the court of appeal also concluded, based on its "exhaustive search of suggested guidelines," that "it is permissible to assess fault between intentional and negligent tortfeasors." Id.
On Southmark's application, we granted certiorari to consider the correctness of the court of appeal's decision. Christi Veazey v. Elmwood Plantation Associates, Ltd. and *715 Southmark Management Corporation, 93-2818 (La. 2/4/94), 633 So.2d 158.

ISSUE
While Southmark contends that the lower courts erred in finding it at fault and in holding it liable for plaintiff's damages which resulted from the rapist's intentional criminal acts, we have reviewed the record and find substantial evidence supporting the finding that the management of the apartment complex misrepresented to plaintiff the security afforded at the complex, that window locks were inadequate, that lighting was poor and that security provided by the complex was substandard. Therefore, the finding of fault on the part of Southmark, which was a contributing cause of plaintiff's damages, is not manifestly erroneous.
As such, the only issues we consider herein are whether the fault of an intentional tortfeasor and a negligent tortfeasor: (1) can; and (2) should, be compared by the finder of fact.

LAW
The issues of whether Louisiana comparative fault principles can and, if so, should apply when the fault of both an intentional tortfeasor and a negligent tortfeasor contributes to the same damages are significant issues of first impression in this Court. The Louisiana comparative fault law was enacted by Act 431 of 1979 (effective August 1, 1980), and thus governs the instant case. Act 431 ushered into Louisiana a comparative fault system by amending and re-enacting La.C.C. articles 2103,[3] 2323 and 2324. To adjust procedurally for those substantive changes in the Civil Code provisions, Act 431 also amended and re-enacted La.Code Civ.Pro. arts. 1811[4] and 1917. These provisions of the comparative fault law all share a common characteristic; "[they all] use the term `fault' when referring to tortfeasor conduct and `negligence' when referring to victim conduct." D. Robertson, Ruminations on Comparative Fault, Duty-Risk Analysis, Affirmative Defenses, and Defensive Doctrines in Negligence and Strict Liability Litigation in Louisiana, 44 La.L.Rev. 1341, 1344 n. 18 (1984) (hereinafter "Ruminations"); Turner v. New Orleans Public Service, Inc., 476 So.2d 800 (La.1985); M. Plant, Comparative Negligence and Strict Tort Liability, 40 La. L.Rev. 403, 413 (1980) (hereinafter "Plant").
The significant effects of the comparative fault law on Louisiana tort law were two-fold. First, the comparative fault law eliminated the harsh all-or-nothing doctrine of contributory negligence, which Louisiana had borrowed from the common law. "Consequently, a plaintiff's claim for damages no longer can be barred totally because of his negligence. At most his claim may be reduced in proportion to his fault." Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166, 170 (La.1985); La.C.C. art. 2323. Second, the comparative fault law altered the rules regarding the relationship between joint tortfeasors, changing the basis for contribution among them from virile share defined as per head to virile share defined in terms of proportionate fault, La.C.C. arts. 1804,[5] and, by later amendment, limiting solidary liability between them. La.C.C. art. 2324, as amended in 1987. In short, the comparative fault law "`provide[d] the framework for a comprehensive scheme of loss apportionment *716 in multiple party litigation.' Chamallas, Comparative Fault and the Multiple Party Litigation in Louisiana: A Sampling of the Problems, 40 La.L.Rev. 373 (1981)." Cole v. Celotex Corp., 599 So.2d 1058, 1062 n. 13 (La.1992).
The comprehensive framework provided by the comparative fault law, however, left several major questions unanswered. See Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1133 (La.1988) (citing Turner, supra). One of the questions left unanswered is the basic question presented here, i.e., whether comparative fault principles should apply when one tortfeasor acts negligently and another tortfeasor acts intentionally to produce the same damages. D. Robertson, 1 Louisiana Practice Series: The Louisiana Law of Comparative Fault: A Decade of Progress 5 (1991) (hereinafter "Decade of Progress") (noting that this is one of the "`tough details [the legislature has] left for the courts to decide'; the comparative fault statutes are opaque on this question"). Forecasting this as a "multiparty difficulty" sure to arise for the courts to decide, the same commentator framed the question before us as follows: whether (and, if so, how) "comparative fault assessment [should] work in a case against defendant A in intentional tort and defendant B in negligence." Ruminations, supra at 1343-44 n. 14.
Construing La.C.C. art. 2323,[6] we have held that it adopted the substantive principle of comparative fault and that it left the particulars of its application for the courts to decide. Bell, supra; Turner, supra; Howard, supra. One such particular is the scope of the comparative fault law's application. Speaking to this issue, La.C.C. art. 2323 simply states that comparative fault applies "[w]hen contributory negligence is applicable to a claim for damages." While that limiting language could conceivably be construed as confining comparative fault to negligence cases, we have declined to read it so narrowly. Bell, supra; Turner, supra. Rejecting such a narrow reading, we reasoned in Turner, supra, that if the legislature had intended to confine the comparative fault law, it could have easily done so; "[o]ne word would have done the job, i.e., `only when contributory negligence is applicable.'" Turner, 476 So.2d at 804 (emphasis added). Likewise, we reasoned in Bell, supra, that La.C.C. art. 2323 neither "state[s] when the courts shall permit a defense of contributory or comparative negligence to affect a plaintiff's recovery, nor does it prohibit the courts from applying comparative negligence to a claim previously insusceptible to the bar of contributory negligence." Bell, 462 So.2d at 170. In sum, rather than reading La.C.C. art. 2323 as restricting judicial expansion of comparative fault to other contexts, we have read that article as leaving it to the court's discretion to determine in what contexts the judicially crafted doctrine of contributory negligence should be invoked and, in turn, mandating that in such contexts the court apply, in its place, comparative fault. Turner, 476 So.2d at 806 (Dennis, J., assigning additional reasons); Bell, supra; Howard v. Allstate Ins. Co., 520 So.2d 715, 718 (La. 1988). Consequently, it is settled that La. C.C. art. 2323 neither prohibits nor mandates the contexts in which the comparative fault law applies.
That the comparative fault doctrine extends beyond the negligence arena into other areas of tort law is likewise settled. Bell, supra (applying comparative fault to some strict products liability cases); Landry v. State, 495 So.2d 1284 (La.1986) (applying comparative fault to case arising under La. C.C. art. 2317); Howard v. Allstate Insurance Co., 520 So.2d 715 (La.1988) (applying comparative fault to cases arising under La. C.C. art. 2321); Turner v. New Orleans Public Service, Inc., 471 So.2d 709 (La.1985) (applying comparative fault to motorist-pedestrian case); see also Pelt v. City of DeRidder, 553 So.2d 1097 (La.App. 3d Cir.1989) *717 (applying comparative fault to case under La.C.C. art. 667 and collecting cases); Decade of Progress, supra (collecting cases). Indeed, a long line of jurisprudence, which we sampled in Landry, supra, establishes that the comparative fault concept applies to a wide array of strict liability cases, despite the conceptual and semantical difficulties in applying the doctrine to such non-negligence based liability. Landry, 495 So.2d at 1290.
The issue before us, here, of course, is whether the comparative fault law extends to wrongful conduct at the opposite end of the spectrumintentional torts. See 3 Comparative Negligence § 19.10[1][iii] (noting that "[a]t the opposite extreme from strict liability lies cases in which defendant has injured plaintiff intentionally"). Recently, several Louisiana appellate courts have concluded that comparative fault principles under La.C.C. art. 2323 apply to intentional torts, some with, and some without, offering reasons or comments for doing so. In so holding, these cases, explicitly or implicitly, have construed the term "fault" contained in the various provisions of the comparative fault law as encompassing both unintentional and intentional conduct that causes injury. Thompson v. Hodge, 577 So.2d 1172, 1177 (La.App. 2d Cir.1991); Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387, 405 (La.App.2d Cir.), writ denied, 513 So.2d 826 (La.1987) (citing F. Stone, Tort Doctrine, 12 La.Civil Law Treatise § 61 (1977)); see also Morris v. Yogi Bear's Jellystone Park Camp Resort, 539 So.2d 70 (La.App. 5th Cir.), writ denied, 542 So.2d 1378 (La.1989) (applying comparative fault to quantify intentional fault of rapist without reasons or comments); McCullom v. Regional Transit Authority, 616 So.2d 239 (La.App. 4th Cir.), writ denied, 620 So.2d 852 (La.1993). Likewise, commentators have suggested that comparative fault law is broad enough to encompass intentional torts. J. Dear and S. Zipperstein, Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations, 24 Santa Clara L.Rev. 1, 37 (1984) (hereinafter "Dear & Zipperstein"); Decade of Progress, supra.
A contrary view, however, has been voiced by some Louisiana appellate courts and a commentator. See Broussard v. Lovelace, 610 So.2d 159 (La.App. 3d Cir.1992), writ denied, 615 So.2d 343 (La.1993) (declining to apply comparative fault to conversion case); Bradford v. Pias, 525 So.2d 134 (La.App. 3d Cir.1988) (declining to apply comparative fault to battery case); Hebert v. First Guaranty Bank, 493 So.2d 150 (La.App. 1st Cir. 1986) (declining to apply comparative fault to conversion case); F. Stone, Tort Doctrine, 12 La.Civil Law Treatise § 61 (1994 Supp.) (hereinafter "Tort Doctrine") (citing holding in Yogi Bear's Jelly Stone Park, supra, and noting caveat that it is "[c]learly an erroneous holding since contributory negligence is inapplicable to intentional torts").
Also significant is the legislature's selection of the dynamic, all-encompassing civilian concept of "fault" as the standard for the tortfeasor's conduct. As noted, the provisions of the comparative fault law all share a common characteristic; they all speak in terms of plaintiff's "negligence" and defendant's or tortfeasor's "fault." Fault, historically, has been the basis for tort liability in Louisiana, being the key word used in La. C.C. art. 2315,[7] the "fountainhead" of tort responsibility in Louisiana. Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133, 136-37 (1971). The Civil Code, however, does not define "fault," and this Court has described attempts at defining fault as a "logomachy,"[8] noting in Langlois that "[b]ecause of the difficulty in defining fault for all times and purposes and instead of defining fault by listing numerous activities which constitute fault (much as we enumerate the activities which constitute criminal conduct in our Criminal Code), our law has left this determination to our courts." Langlois, 249 So.2d at 137; Tort Doctrine, supra, at § 60 (noting that "fault is the mirror of our times: *718 ... fault is a fluid term definable only with respect to its surroundings").
However, certain definitions of the word have been judicially articulated and are instructive in our analysis. One such articulation is that "fault is a broad concept embracing all conduct falling below a proper standard." Weiland v. King, 281 So.2d 688, 690 (La.1973) (citing Langlois, supra, and Tort Doctrine, supra). As this definition reflects, "fault" under civilian theory clearly includes more than just negligence; it extends the gamut from strict liability to intentional torts. Tort Doctrine, supra at § 61 (describing fault as including "intentional harm caused to another without consent or privilege"); see Plant, supra at 413-15.
Given the existing statutory scheme and this Court's prior case law, we find that comparative fault law as it exists in Louisiana is broad enough in an appropriate factual setting to encompass the comparison of negligent and intentional torts. However, our conclusion that such a comparison can be made does not end the inquiry; instead, it simply raises the more difficult question of whether such a comparison should be made in general and, more specifically, whether such a comparison should be made in this particular case.[9]
As we have previously explained herein, this Court has heretofore read La.C.C. art. 2323 as leaving it to the Court's discretion to determine in what contexts the doctrine of comparative negligence should be applied. See Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1113 (La.1990); Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1133 (La. 1988); Howard v. Allstate Ins. Co., 520 So.2d 715, 718 (La.1988); Landry v. State, 495 So.2d 1284 (La.1986); Turner v. New Orleans Public Service, Inc., 471 So.2d 709 (La.1985); Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166 (La.1985). As this Court stated in Bell, supra:
For example, the question of whether other classes of cases fall within the category to which comparative fault may apply must be decided on a case-by-case basis.
Bell, 462 So.2d at 172.
Though the accident at issue in Bell occurred before the effective date of comparative fault, we have adhered to the line of reasoning expressed in that case, i.e., that application of comparative fault principles in certain types of cases requires a case-by-case analysis. For instance, in the area of strict liability, though we have repeatedly held that comparative fault principles generally apply in strict liability cases involving victim fault, we have also consistently maintained that application of comparative fault principles to allocate fault between an injured plaintiff and the party with garde or custody of the property or object producing the harm in a particular case depends in part upon the court's determination of whether reducing the injured party's recovery through a comparative fault allocation will serve as an incentive for a similarly situated person to exercise care or, in contrast, operate to reduce the incentive of the owner of the thing at issue to remove the risk of harm. See Sistler, supra; Landry, supra ("The courts are applying the comparative fault principles to strict liability cases on a case by case basis and as the facts and circumstances lead the courts to do so."). This case-by-case approach is also reflected in our appellate courts' decisions to alternatively either apply, or decline to apply, comparative fault principles in intentional tort cases involving battery and conversion, depending upon the facts and circumstances presented in the particular cases at issue. See supra.
Given the fact that we have held herein that the concept of comparative fault as it exists in Louisiana is broad enough to encompass the comparison of intentional acts *719 and negligence in appropriate factual circumstances, we see no reason why the same sort of case-by-case analysis as that employed by the courts in a strict liability setting should not be employed by the courts in determining whether to apply comparative fault principles in cases where it is alleged that comparative fault exists among intentional tortfeasors and negligent tortfeasors. That being said, public policy considerations inherent in the question of whether such a comparison should be made compel us to find, as did the trial court, that such a comparison should not be made in this particular case.
First, and foremost, the scope of Southmark's duty to the plaintiff in this case clearly encompassed the exact risk of the occurrence which caused damage to plaintiff. As a general rule, we find that negligent tortfeasors should not be allowed to reduce their fault by the intentional fault of another that they had a duty to prevent. See Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc., 249 Kan. 348, 819 P.2d 587, 606 (1991).
Second, Southmark, who by definition acted unreasonably under the circumstances in breaching their duty to plaintiff, should not be allowed to benefit at the innocent[10] plaintiff's expense by an allocation of fault to the intentional tortfeasor under comparative fault principles. Given the fact that any rational juror will apportion the lion's share of the fault to the intentional tortfeasor when instructed to compare the fault of a negligent tortfeasor and an intentional tortfeasor,[11] application of comparative fault principles in the circumstances presented in this particular case would operate to reduce the incentive of the lessor to protect against the same type of situation occurring again in the future. Such a result is clearly contrary to public policy.
Third, as Dean Prosser has explained it, intentional wrongdoing "differs from negligence not only in degree but in kind, and in the social condemnation attached to it." Prosser and Keeton on the Law of Torts § 65, at p. 462 (5th Ed.1984). In our view, this is a correct assessment of the character and nature of the conduct which defendant herein seeks to have the courts compare. Because we believe that intentional torts are of a fundamentally different nature than negligent torts, we find that a true comparison of fault based on an intentional act and fault *720 based on negligence is, in many circumstances, not possible.[12]
In sum, we hold that while Louisiana law is broad enough to allow comparison of fault between intentional tortfeasors and negligent tortfeasors, determination of whether such a comparison should be made must be determined by the trial court on a case by case basis, bearing in mind the public policy concerns discussed herein.[13] We further hold, for the reasons stated herein, that comparison of Southmark's negligence and the rapist's fault in this particular case is not appropriate. As such, it was not error for the trial judge in this case to refuse to submit a special interrogatory to the jury for comparison of Southmark's and the rapist's respective fault.

DECREE
AFFIRMED.
WATSON, J., joins the opinion and adds additional reasons.
LEMMON and HALL, JJ., dissent and assign reasons.
MARVIN, J., dissents for the reasons assigned by HALL, J.
*721 WATSON, Justice, adding concurring reasons.
The dissenters urge that we adopt their new (for Louisiana) theory of comparing intentional fault with negligence or strict liability, saying that difficulty of comparison is no reason to eschew this idea. It is not the difficulty of comparison: it is the impossibility.
The rapist or murderer is 100% at fault. His intentional fault cannot be compared logically with the negligence of a party who facilitates the crime. Likewise, there can be no comparison with the injured victim's fault, as appealing as the theoretical concept may be.
I join the opinion and respectfully add these brief comments.
HALL, Justice, dissenting.
I respectfully dissent.
After a scholarly and accurate analysis of fault and comparative fault principles, the majority opinion correctly concludes that comparative fault law as it exists in Louisiana is broad enough in an appropriate factual setting to encompass the comparison of negligent and intentional acts. This conclusion does not, as the majority opinion states, end the inquiry. We must determine whether such a comparison should be made in general or, more specifically, should be made in this case. Stated otherwise, we must determine whether there are any policy considerations that would preclude an application of comparative fault principles to intentional tort cases in general, and to the facts of this case in particular. It is in this further determination that I part company with the majority. I conclude that there are no public policy considerations which militate against applying the comparative fault and limited solidary liability principals of LSA-C.C. arts. 2323, 2324 and 1804, and LSA-C.C.P. art. 1812, to allocate fault between an intentional tortfeasor and a negligent tortfeasor consistent with the development of comparative fault law in this state.
Focusing first on the facts of this particular case, the question presented here is whether to compare the fault of an intentional co-tortfeasorthe non-party rapist against that of a negligent co-tortfeasor Southmark. This particular question takes this case outside of the traditional "two party model"the contributorily negligent plaintiff and the intentional negligent tortfeasorand places it into the multiple tortfeasor context. J. Leibman, Comparative Contribution and Intentional Torts: A Remaining Roadblock to Damages Apportionment, 30 Am.Bus.L.J. 677 (1993) (hereinafter "Leibman"). In the multiple tortfeasor setting, additional issues of contribution and solidary liability between joint tortfeasors are interjected. Id.; Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222, 229, 18 A.L.R.5th 1031 (1991) (noting that "[a] court's determination whether certain conduct is amenable to apportionment under the [New Jersey Comparative Negligence] Act affects not only the plaintiff's potential recovery, but also the liability among joint tortfeasors"). For guidance on the issue before us, we should turn to our recent jurisprudence addressing two multiparty issues that arise under the comparative fault law.
The first multiparty issue we recently resolved is that the comparative fault law applies to all "phantom" tortfeasors. Gauthier v. O'Brien, 618 So.2d 825 (La.1993).[1] Employing expressly the phantom tortfeasor term, we wrote:
Louisiana juries are not unfamiliar with the allocation of fault to non-parties. Phantom tortfeasors' fault has been assessed pursuant to former La.Code of Civ. Proc. art. 1811(B)(2), now article 1812. Allocation of fault pursuant to [La.C.C.] article 2324 is not likely to result in jury confusion in light of the prior experience in this area. Failure to submit a special jury interrogatory to the jury to determine the fault, if any, of a third party constitutes error.
Gauthier, 618 So.2d at 831 (citations omitted). In reaching that conclusion, we noted that "[t]he rationale for allocating fault to all *722 who may be culpable is that `[t]rue apportionment cannot be achieved unless that apportionment includes all tortfeasors guilty of causal negligence either causing or contributing to the occurrence in question, whether or not they are parties to the case.'" 618 So.2d at 830 (quoting Pocatello Indus. Park Co. v. Steel West, Inc., 101 Idaho 783, 621 P.2d 399, 403 (1980)); see also Chamallas, Comparative Fault and the Multiple Party Litigation in Louisiana: A Sampling of the Problems, 40 La.L.Rev. 373, 389 (1981) (hereinafter "Chamallas") (noting that the comparative fault law "contemplates that the conduct of all persons responsible for plaintiff's injury should be evaluated by the fact finder").
The procedural mechanism by which phantom tortfeasor fault is considered is set forth in LSA-C.C.P. Art. 1812(C)(2), which provides for submission of a special jury interrogatory regarding whether another person, whether nonparty or not, was at fault.[2] Construing LSA-C.C.P. Art. 1812(C), we held in Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1309 (La.1984), that "[w]hile La.C.C.P. art. 1812C provides that the court may (unless waived by all parties) submit special written questions to the jury, the apparent intent is that the court in such circumstances is required to submit the questions." Lemire, 458 So.2d at 1309 (citing 1983 Revision Comments to LSA-C.C.P. Art. 1812, Section (b)). Hence, Lemire mandates the submission of such special interrogatory, when appropriate. See Veal v. Forrest, 543 So.2d 1121, 1123 n. 3 (La.App. 1st Cir.1989). Submission of such special interrogatory becomes appropriate when evidence supporting a finding of fault on the part of a phantom tortfeasor is presented. Brock v. Winn Dixie Louisiana, Inc., 617 So.2d 1234, 1238 (La. App. 3d Cir.), writ denied, 620 So.2d 848 (La.1993) (citing Devereux v. Allstate Ins. Co., 557 So.2d 1091 (La.App.2d Cir.1990)). When such evidence exists, the trial court's refusal to submit such special interrogatory to the jury to permit the allocation of fault to the phantom tortfeasor is erroneous. Gauthier, 618 So.2d at 831; Perez v. State, Through Dept. of Transportation and Development, 578 So.2d 1199 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991).
Recapping, a settled substantive issue is "that Gauthier requires the quantification of the fault of all types of phantom tort-feasors." D. Robertson, Solidary Liability in Tort: Understanding Gauthier and Touchard, Who Pays How Much?, Part 2, 41 La. Bar J. 334, 335 (1993) ("Understanding Gauthier"). The rationale for this rule is that "`[t]o limit the jury to viewing the negligence of only one tortfeasor and then ask it to apportion that negligence to the overall wrong is to ask it to judge a forest by observing just one tree. It cannot, and more importantly should not, be done. It simply is not fair to the tortfeasor which plaintiff chooses to name in his lawsuit.'" L. Eilbacher, Comparative Fault and the Nonparty Tortfeasor, 17 Ind.L.Rev. 903, 906 n. 2 (1984); see also Chamallas, supra at 389 (noting that "[i]f a tortfeasor is absent, problems may arise in assessing the correct percentage of fault to the existing parties to the litigation"); Gauthier, 618 So.2d at 833 (Lemmon, J., concurring). Similarly, a settled procedural issue is that when evidence of phantom tortfeasor fault is presented, the trial court is required, under LSA-C.C.P. Art. 1812(C)(2), to submit to the jury the special interrogatory so as to permit the allocation of fault to such nonparty tortfeasor.
Another recently settled multiparty issue under the comparative fault law is that a limited form of the civilian concept of solidary liability between joint tortfeasors[3] is retained in LSA-C.C. Art. 2324.[4]Touchard *723 v. Williams, 617 So.2d 885, 891-92 (La.1993). As we observed in Touchard, solidary liability is "founded on the notion that the innocent plaintiff should obtain full compensation from any person whose fault was an indispensable factor in producing the harm." 617 So.2d at 890. Under the solidary obligation provision in effect before Act 431 of 1979 and thereafter until LSA-C.C. Art. 2324 was amended by Act 373 of 1987, any tortfeasor could be compelled to pay the entire judgment; hence, "a solvent defendant was subjected to paying the tab for other defendants who are insolvent, undeterminable, or hidden." Id. Act 431 altered that rule somewhat, and the 1987 amendment to LSA-C.C. Art. 2324 altered that rule even more.
In Touchard, we thoroughly canvassed those changes in LSA-C.C. Art. 2324, including the legislative history behind them, and concluded that:
[T]he final version of [LSA-C.C. Art. 2324] adopted by the Legislature represents a compromise between the competing interests of judgment creditors and judgment debtors. Judgment debtors are no longer exposed to solidary liability for 100% of the judgment creditor's damages except where the joint tortfeasors commit "an intentional or wilful act." Instead, a judgment debtor's exposure is limited, in the absence of a greater than 50% assignment of that debtor's fault, to fifty percent of the plaintiff's "recoverable damages." Nevertheless, a judgment debtor's liability, in the absence of the judgment creditor being assigned a greater degree of fault, is not limited to his assigned percentage of fault, as the original bill had proposed.
Similarly, a judgment creditor is precluded from securing 100% recovery from one or another of the joint tortfeasors, except where the tortfeasors commit "an intentional or wilful act," or a given tortfeasor is assigned 100% of the fault. Yet such, a judgment creditor is not limited to recovering from each tortfeasor only his percentage of fault, unless the judgment creditor is assigned a greater degree of fault than the given tortfeasor.
617 So.2d at 891-92. Hence, Touchard resolves the issue of the proper reading of the concededly confusing limited solidarity rule set forth in LSA-C.C. Art. 2324, holding that "the article [as currently written] was intended to provide a cap on solidarity among joint tortfeasors of 50%," as opposed to the previously existing 100%, and, significantly, that "[t]he balance, reached by the legislature, shares the risk of insolvent, incapable of paying, undeterminable, and hidden [phantom] tortfeasors" between judgment debtors (defendants) and creditors (plaintiffs). 617 So.2d at 891-93.[5]
*724 Against this backdrop, I return to the specific, unsettled issue before us of whether it is proper, as a policy matter, to compare the negligent conduct of one co-tortfeasor against the intentional conduct of another co-tortfeasor. This issue has two facets: (i) whether the comparison of the concurrent fault of negligent and intentional tortfeasors should be permitted under the comparative fault law; and (ii), if so, how to treat the fault assessed to the non-party, intentional tortfeasor.
Building on our recent jurisprudence, I start with the notion underlying the comparative fault law of equitable apportionment of losses among all responsible tortfeasors parties and nonpartieswhich we recognized in Gauthier, and the retention of limited solidary liability and the resulting sharing of the risk of losses attributable to insolvent and phantom tortfeasors between plaintiffs and defendants, which we recognized in Touchard. Under our recent jurisprudence, it is clear that in a multiparty litigation involving two or more negligent co-tortfeasors, each tortfeasor is apportioned a percentage of fault and each, excepting a tortfeasor assigned more than 50% fault or less fault than that assigned the plaintiff, is generally solidarily responsible for 50% of plaintiff's recoverable damages. Altering the hypothetical to include an intentional tortfeasor and assuming a judicial refusal to permit the allocation of fault to such intentional tortfeasor results, as the lower courts held in this case, in the negligent tortfeasor(s) being held liable for the entirety of plaintiff's damages. This resultholding the negligent tortfeasor(s) responsible for the entirety of the damages because of the mere happenstance that a co-tortfeasor committed an intentional, as opposed to a negligent, wrongdoingis anomalous.
This anomaly that arises in the context of concurrent fault of negligent and intentional tortfeasors has only recently received judicial attention; the scarcity of judicial attention to the problem is explained by the fact that state legislatures, including the Louisiana legislature, only recently have limited joint and several, or solidary, liability. Medina v. Graham's Cowboys, Inc., 113 N.M. 471, 827 P.2d 859, 864 (Ct.App.1992). The few recent cases to address the issue in the context of comparative fault and less than full joint and several, or solidary, liability, however, have generally agreed that resolution of the anomaly requires allocation of fault between the negligent and intentional tortfeasors. Weidenfeller v. Star and Garter, 1 Cal.App.4th 1, 2 Cal.Rptr.2d 14 (Ct.App. 4 Dist.1991) (holding that when concurrent negligence of one tortfeasor and intentional misconduct of an assailant caused plaintiff's injury, negligent tortfeasor's liability was limited to its percentage of fault); Martin By and Through Martin v. United States, 984 F.2d 1033 (9th Cir.1993) (finding result in Weidenfeller a correct construction of California law); Medina, supra (holding that fault of intentional and negligent tortfeasors should be compared with negligent tortfeasor bearing responsibility only for its percentage of the damages, but holding negligent tortfeasor responsible for entirety of damages under alternative theory of respondeat superior for negligent hiring of intentional tortfeasor); Cf. Kansas State Bank & Trust Co. v. Specialized Transp. Services, Inc., 249 Kan. 348, 819 P.2d 587 (1991) (noting inconsistency in law but refusing to permit apportionment of fault between negligent and intentional tortfeasors).
Agreeing, I would hold that Southmark's negligent fault and the nonparty rapist's intentional fault must be compared and, finding that the rapist's fault was greater than that of Southmark's, as explained more fully hereafter, Southmark's solidary liability must be limited to 50% of plaintiff's recoverable damages.
Turning back to the more general issue of whether comparative fault principles should be extended to intentional tort cases, I believe that they should and that such extension is consistent with both the language and the underlying policies of the comparative fault law.[6] In so finding, I acknowledge that *725 the position of extending comparative fault principles to the intentional tort context is a minority one. A. Schwartz, Applicability of Comparative Negligence Principles to Intentional Torts, 18 A.L.R.5th 525 (1994). Nonetheless, the historically rooted rationales underlying the majority position are inapposite under the Louisiana comparative fault law. More particularly, those historically rooted rationales are three-fold; namely: (i) the harshness of the contributory negligence bar; (ii) the theory that intentional fault is "different in kind"; and (iii) the policy considerations of deterring and punishing intentional tortfeasors. Dear & Zipperstein, supra at 387-92. I address each of these in turn.
The first rationale regarding the harshness of the contributory negligence bar is based on the pre-comparative fault, black letter law that contributory negligence was never applicable to intentional tort cases. See W. McNichols, Should Comparative Responsibility Ever Apply to Intentional Torts?, 37 Okla. L.Rev. 641, 647 (1984) (noting common law rule that contributory negligence was never applicable to intentional torts); White v. Gill, 309 So.2d 744 (La.App. 4th Cir.1975) (citing rule that contributory negligence is not a defense to intentional torts). This black letter law, the argument goes, was carried over under the comparative fault enactments. Continuing, the rationale is that because comparative fault evolved to compensate tort victims who were barred from recovery by the harsh all-or-nothing rule of contributory negligence, comparative fault should not be applied in contexts in which contributory negligence was not previously a defense, as it would place these plaintiffs in a worse position. A. Schwartz, Applicability of Comparative Negligence Principles to Intentional Torts, 18 A.L.R.5th 525 (1994).
This rationale, however, overlooks the fact that comparative fault does not bar, but rather merely reduces, a plaintiff's recovery. "Thus the undue harshness rationale for refusing to compare plaintiff's negligence with defendant's intentional fault disappears." G. Hollister, Using Comparative Fault to Replace the All-or-Nothing Lottery Imposed in Intentional Tort Suits in Which Both Plaintiff and Defendant Are At Fault, 46 Vand. L.Rev. 121, 133 (1993) ("Hollister") (noting that applying comparative fault, in fact, will result in more equitable results). Furthermore, this rationale is clearly inapposite given our clear holdings putting to rest any notion that LSA-C.C. Art. 2323 cabins the comparative fault law to contexts in which contributory negligence was formerly a defense. Turner, supra; Bell, supra; Howard, supra.
The second rationale, oft-cited and relied on by the majority, for refusing to apply comparative fault to intentional torts is that intentional torts are "different in kind" than negligent torts and are thus incomparable. This rationale is based on the position posited by Dean Prosser that intentional wrongdoing "`differs from negligence not only in degree but in kind, and in the social condemnation attached to it.'" 3 Comparative Negligence § 19.10[1][iii] (quoting Prosser and Keeton on the Law of Torts § 65, at p. 462 (5th Ed.1984)). This rationale has been rejected, however, by at least one court and by several commentators. Blazovic v. Andrich, 590 A.2d at 231 (finding that intentional torts and negligent torts are not "different in kind," but rather "different in degree"); Dear & Zipperstein, supra at 2 (noting that "negligence, reckless, and intentional conductthe three traditional classifications of faultare not different in kind, but merely reflect degrees of violation of a common social norm"); Leibman, supra; Hollister, supra at 135-136. As one commentator notes, this rationale should be rejected for two reasons: "First, although the conclusion that intent and negligence are different in kind sounds appealing, significant doubt exists that they are. Second, even if they are different in *726 kind, that is not a sufficient reason to require that one of two faulty people bear the entire loss." Hollister, supra at 135-36.
The contrary view that intentional torts are different in kind is based on the fictional notion that "`[t]he law of intentional torts constitutes a separate world of legal culpability.' " Leibman, supra at 693 n. 86 (quoting Mills v. Reynolds, 807 P.2d 383 (Wyo.1991) (Urbrigkit, J., dissenting)). That view of tort law consisting of compartmentalized concepts of legal culpability, however, has never been the law in this state and is inconsistent with the "fault" concept embodied in our comparative fault law. Consequently, I would join the New Jersey Supreme Court in concluding that intentional torts and negligent torts are not "different in kind," but rather "different in degree." See Blazovic, supra.
Furthermore, this "apples and oranges" argument can easily be rejected in jurisdictions, like Louisiana, that have extended comparative fault to strict liability torts. Hollister, supra at 142. Indeed, intentional torts, at least on a conceptual level, are more capable of comparison against negligent torts than are strict liability torts. Strict liability torts are premised on a tortfeasor's status or relationship and not on actual fault; whereas, both intentional and negligent torts are premised on the tortfeasor's actual fault. Hence, "[a]lthough courts in extending comparative principles to strict tort liability actions have gone so far as to allow comparison of conduct truly dissimilar (fault compared with no-fault), we do not need to venture so far in order to extend comparative principles to appropriate intentional tort cases." Dear & Zipperstein, supra at 36.
The final rationale voiced against applying comparative fault to intentional torts, also relied on by the majority, is that it will decrease the deterrent or punitive aspects of tort recovery. This rationale is especially weak in jurisdictions, like Louisiana, that generally do not recognize punitive damages. Hollister, supra at 146 n. 100 (observing that "[a]ll these states [that do not recognize punitive damages, including Louisiana] have determined that punishment is not a proper function for tort law, and thus they should not cite punishment as a justification for prohibiting comparative fault"); Mitigation Comment, supra at 118 (noting that "[n]owhere has Louisiana law recognized that an intentional tortfeasor should be punished for his acts. Other states, who deal firmly with intentional tortfeasors and attempt to deter such actions, allow punitive damages to be awarded"). I thus find this rationale inapposite to the Louisiana comparative fault law.
The position that comparative fault principles should be applied to intentional torts is buttressed by the New Jersey Supreme Court's holding in Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222, 227-231, 18 A.L.R.5th 1031 (1991). There, the New Jersey court, in reaching the same result, premised its holding by noting that it was "unpersuaded by the decisions of other jurisdictions that reject apportionment of fault in actions involving intentional tortfeasors." 590 A.2d at 231. Continuing, the New Jersey court, as I would do, rejected the three historically advanced policy rationales cited in support of the prevailing majority position, writing:
Those decisions derive from an earlier era when courts attempted to avoid the harsh effect of the contributory negligence defense and sought to punish and deter intentional tortfeasors. Refusal to compare the negligence of a plaintiff whose percentage of fault is no more than fifty percent with the fault of intentional tortfeasors is difficult to justify under a comparative-fault system in which that plaintiff's recovery can be only diminished, not barred.
Moreover, we reject the concept that intentional conduct is "different in kind" from both negligence and wanton and willful conduct, and consequently cannot be compared with them. Instead, we view intentional wrongdoing as "different in degree" from either negligence or wanton and willful conduct.... Neither that difference nor the divergence between intentional conduct and negligence precludes comparison by a jury. The different levels of culpability inherent in each type of conduct will merely be reflected in the jury's apportionment of fault. By viewing the various types of tortious conduct in that way, we adhere most closely to the guiding principle of comparative faultto distribute *727 the loss in proportion to the respective faults of the parties causing that loss. Thus, consistent with the evolution of comparative negligence and joint-tortfeasor liability in this state, we hold that responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including fault attributable to an intentional tortfeasor.
Apportionment of fault between intentional and negligent parties will not eliminate the deterrent or punitive aspects of tort recovery. Where tortious conduct merits punitive as well as compensatory damages, a plaintiff's comparative fault will reduce recovery only of compensatory damages.
590 A.2d at 231. Moreover, the court rejected the argument that the business owner whose negligence facilitated the commission of a crime on its property would be any less compelled to protect against such future actions by assessing damages in proportion to fault. Id. at 233.
Recapping, the comparison of an intentional tortfeasor's fault against a negligent tortfeasor's fault is consistent both with the statutory language and the underlying policies of the Louisiana comparative fault law and the concept of limited solidary liability between joint tortfeasors.
Applying the above principles to the facts of the instant case, I would first conclude that the lower courts erred, as a matter of law, in failing to require the allocation of fault between the negligent defendant, Southmark, and the intentional tortfeasor, the phantom rapist. Unquestionably, there was evidence that the rapist's despicable criminal acts were the most significant contributory cause of plaintiff's damages, thus requiring under LSA-C.C.P. Art. 1812(C) and Gauthier, supra, the allocation of fault to the phantom rapist. The lower courts thus erred in allocating all the fault to Southmark, requiring that the JNOV be vacated. While neither lower court considered the rapist's fault, this court should, based on the complete record before us, reallocate the fault among the parties and amend the judgment accordingly. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Otto v. State Farm Mut. Auto. Ins. Co., 455 So.2d 1175 (La. 1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980); Rossell v. ESCO, 549 So.2d 840 (La.1989).
As to plaintiff, the lower courts correctly concluded that she was free from fault. In this regard, I agree with the court of appeal that the record is devoid of any evidence to support a finding that plaintiff somehow was responsible for her own rape. Veazey, 625 So.2d at 681. Likewise, I agree with the majority opinion that the lower courts did not manifestly err in concluding that Southmark was at fault, despite Southmark's vigorous contentions to the contrary.
I now address the question of how to allocate fault between Southmark and the phantom rapist. In this regard, I note the reality that a jury ordinarily will apportion the lion share of the fault to the intentional tortfeasor and the remaining fault to the negligent parties according to their level of culpability. Dear & Zipperstein, supra. I further note, as the Louisiana appellate courts have recognized in applying comparative fault principles to assault and battery cases, that the factors we articulated in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), are well-suited for assisting in this comparison. Specifically, Watson sets out the following factors for apportioning fault among joint tortfeasors:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id. at 974. Moreover, we noted in Watson that "`[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault *728 and the extent of the causal relation between the conduct and the damage claimed.'" Id. It follows that the concept of comparative causation we adopted in Howard v. Allstate Ins. Co., 520 So.2d 715 (La.1988), for strict liability cases can also be used in making this comparison.
Applying the Watson factors and comparative causation to the instant facts, I find that although Southmark's negligence contributed to plaintiff's injury, its negligence was not the major cause of plaintiff's damages; the major cause of plaintiff's damages was the rapist's conduct. Accordingly, I would find the appropriate allocation of fault to be 90% to the phantom rapist and 10% to Southmark.
As noted, the issue before us has a second facet: how to treat the fault assessed to the nonparty intentional tortfeasor? Stated otherwise, having decided that the nonparty, intentional tortfeasor's fault must be quantified and having quantified that fault, it must now be decided how to treat the intentional tortfeasor's fault which is thus determined. One commentator suggests that the ratio approach adopted in Gauthier v. O'Brien, 618 So.2d 825 (La.1993), for the employer-employee-third party tortfeasor setting, should likewise be adopted for the phantom tortfeasor setting. D. Robertson, Solidary Liability in Tort: Understanding Gauthier and Touchard, Who Pays How Much?, Part 2, 41 La.Bar J. 334, 335 (1993) (suggesting that "[t]here is no good reason not to use the ratio approach so as to treat all phantom tortfeasors the same way"). The commentator concedes, however, that Gauthier can be read as limiting the ratio approach to "parties," given the following language in Gauthier, "the judge, after the jury has returned a verdict, should disregard the proportion of fault assessed to the employer and reallot the proportionate fault of all other blameworthy parties." Gauthier, 618 So.2d at 833 (emphasis supplied).
There is a difference between an immune tortfeasor (specifically an employer immune from tort liability under the worker's compensation law) and a tortfeasor who is subject to liability, solidarily to an extent with the defendant tortfeasor, but is not a party to the suit for one reason or another, perhaps plaintiff's choice or, as in this case, because identity of the tortfeasor is unknown.
Application of the ratio approach of reallocating employer fault on the basis of proportionate fault of other blameworthy parties in Gauthier, supra, was done in the context of the employer-employee-third party tortfeasor setting in order to minimize the adverse impact on the employee by reason of the employer's fault, consistent with the worker's compensation-statutory immunity scheme. It does not necessarily follow that the ratio approach should be applied outside of the worker's compensation-statutory immunity setting to a case in which the nonparty tortfeasor is not statutorily immune from liability, and does not have any special relationship to plaintiff.
Absent the special circumstances arising in the employer-employee-third party tortfeasor setting, the application of the ratio approach should not be extended, and the provisions of LSA-C.C. Art. 2324 should be applied in a straightforward manner. The fault of all parties should be quantified. Applying my findings in this case, under LSA-C.C. Art. 2324, defendant Southmark's liability based on 10% fault is solidary with that of the nonparty, intentional tortfeasor to the extent of 50% of plaintiff's recoverable damages and to that extent a portion of the nonparty's fault is, in effect, allocated to defendant. Allocation to defendant of the entire 90% fault of the nonparty intentional tortfeasor on a ratio basis in this case in which plaintiff is free from fault would result in casting the 10% at fault, negligent tortfeasor for 100% of the plaintiff's damages, a result entirely contrary to the provisions of LSA-C.C. Art. 2324, which limit that tortfeasor's solidary liability to 50% of plaintiff's damages. While the plaintiff's recovery is, of course, adversely affected more than if the nonparty tortfeasor's fault were ignored or allocated on a ratio basis, the plaintiff nonetheless is permitted to recover a large part of her damagessubstantially more than the negligent defendant's proportionate share of the faultwhich is an equitably justifiable result.
*729 For the reasons set forth in this dissent, I would amend the judgment of the trial court, as affirmed by the court of appeal, to reallocate fault 10% to the defendant, Southmark Management Corporation, and 90% to the nonparty, phantom rapist, and to cast Southmark for 50% of plaintiff's damages, that is, $90,000.
LEMMON, Justice, dissenting.
The comparative fault system in Louisiana, which became effective in 1980, has proved to be fair and equitable. Much of this fairness is attributable to the simplicity of the system. Human beings learn from childhood to attribute fault, and while there have been exceptions, jurors have handled their duties well in the comparative fault system.
Another factor in the success of comparative fault is that this court has applied the system uniformly across the board, without exception. Prior attempts in this court to create exceptions have arisen in the context of comparing the tortfeasor's fault with the tort victim's contributory negligence, and this court, cognizant of the myriad of exceptions that had been created in reaction to the harshness of the all-or-nothing contributory negligence system, has declined to approve exceptions that were no longer necessary.[1]
The majority has now created an exception in this case, purportedly because of the difficulty of comparing negligent conduct with intentional conduct. But negligent acts and intentional acts are simply two different degrees of "fault," a term in La.Civ.Code art. 2315 that this court has long recognized includes more than mere negligence. See Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133 (1971); Inabnet v. Exxon Corp., 642 So.2d 1243 (La.1994). Negligent torts and intentional torts are not different in kind, but rather are different in degree. Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991).
In the present case, the fault of two tortfeasors combined to produce the single injury to the tort victim. In such a case, solidary liability for the damages from the victim's injury arises by operation of law. La.Civ. Code art. 2324. The Civil Code also prescribes the operation of solidarity, both as between the tortfeasors themselves, La.Civ. Code art. 1804, and in relation to the fault of the tort victim, La.Civ.Code art. 2324.
The solidarity prescribed by the Civil Code for joint tortfeasors is the underlying reason why the majority refuses to consider an intentional tortfeasor and a negligent tortfeasor as joint tortfeasors (although the fault of each unquestionably combined to produce a single injury). Because the Legislature in 1987 placed a limitation on solidarity, the result of comparing the fault of an intentional tortfeasor with that of a negligent tortfeasor is to reduce the tort victim's recovery when the negligent tortfeasor is solvent and the intentional tortfeasor is an insolvent or unidentified criminal.[2] Nevertheless, the fact that the Legislature has seen fit to limit the civilian concept of solidarity should not induce this court to vary from our consistent policy of applying comparative fault across the board, at least as between tortfeasors.
The majority's position that comparing negligent conduct with intentional conduct is difficult simply does not ring true. As stated earlier, negligent conduct and intentional conduct are not different in kind, but are only different in degree. The spectrum of degrees of fault runs from simple negligence to gross negligence to willful and wanton conduct to intentional conduct. No one has ever suggested that simple negligence by one *730 tortfeasor should not be compared to gross negligence by a second tortfeasor when the conduct of the multiple tortfeasors combines to produce a single injury, even though the two are different in degree. Difficulty of comparison is a hollow basis for refusing to apply comparative fault uniformly.[3]
One could more rationally argue that one tortfeasor's negligence cannot or should not be compared with another's strict liability. Consider, for example, the facts of Dusenbery v. McMoRan Exploration Co., 458 So.2d 102 (La.1984), a pre-comparative fault case. There, the plaintiffs' decedent was killed when McMoRan's well exploded because a welding subcontractor had installed a nipple in the well's pressure system that was lighter than the nipple required by the specifications. McMoRan, who was strictly liable solely because of its status as owner of the well, was held solidarily liable to the plaintiffs for their damages, although McMoRan was allowed one hundred percent indemnity against the welding contractor. Had this accident occurred during the comparative fault regime, one would have difficulty in comparing the welding contractor's negligence with any "fault" on the part of the strictly liable defendant.
Nevertheless, since the advent of comparative fault, this court has applied comparative fault in a strict liability situation (although the case did not involve multiple tortfeasors).[4] In Howard v. Allstate Ins. Co., 520 So.2d 715 (La.1988), this court compared the fault of a strictly liable defendant with that of a contributorily negligent tort victim, when an eleven-year old girl went through two gates and a "Beware of Dog" sign into a yard where she was bitten by defendant's dog. This court affirmed the trial court's finding of fifty percent fault by the child. See also Landry v. State of Louisiana, 495 So.2d 1284 (La.1986) (comparative fault applies to reduce the recovery of a plaintiff under La.Civ. Code art. 2317 against the strictly liable Levee Board when the plaintiff negligently failed to see the hole in the ground next to the sea wall). The comparison of fault in a strict liability situation is much more conceptually difficult than a comparison between negligent and intentional conduct. Nevertheless, uniform application of a comparative fault system dictates application of the less conceptually difficult comparison of the fault of a rapist with the fault of an apartment manager whose negligence made the rapist's entry into the victim's apartment easier to accomplish and contributed to the victim's single injury.
Finally, while deterrence of substandard conduct is a major goal of the tort system, I cannot say that the legislative mandate requiring payment of fifty percent of the tort victim's total damages by a tortfeasor who is perhaps ten percent at fault will not serve a deterrent purpose.
CALOGERO, Chief Justice, concurring in denial of rehearing.
I concur in the denial of rehearing because I agree that the result reached in the original hearing of this case, i.e. allowing the plaintiff to recover 100% of her damages from the negligent tortfeasor, Southmark, was a correct one and should not be disturbed. I would vote to grant a rehearing revisiting *731 only the legal issues, but reconfirming the judgment on original hearing, if there were a majority agreeing upon a legal rationale in support of the majority's result on original hearing. See Lone Star Industries, Inc. v. American Chemical, 491 So.2d 1333 (La. 1986) (on rehearing). However, since I perceive the Court to be badly split on this issue, and since I note that at least four justices agree with the result on original hearing, I vote to deny rehearing in this case.
I write separately to voice my disagreement (for the same reasons set forth in the dissenting opinion of Justice Hall) with the rationale of the majority opinion, essentially that a trial court may elect, on an ad hoc basis, to withhold from the jury consideration of the fault of an intentional tortfeasor. See Gauthier v. O'Brien, 618 So.2d 825 (La.1993); Lemire v. NOPSI, 458 So.2d 1308 (La.1984). In my opinion the relevant articles of our Civil Code establish a preferable mode of analysis which obviates the need to allocate fault between the intentional and negligent tortfeasors in this case, preserving the 100% recovery of the plaintiff from the negligent defendant, Southmark.

I. The majority opinion misapplies the concept of comparative fault
The majority opinion as well as the dissenting opinions discuss extensively why "comparative fault" principles should apply in this case. "Comparative fault" is defined by LSA-C.C. Art. 2323, and should apply only to a comparison of fault between a plaintiff and a defendant. The practice of allocating fault between defendants does not arise because of "comparative fault" principles, but rather as a process of determining the "virile portion" of a defendant's share of a solidary obligation. See LSA-C.C. Arts. 1797, 1804. The majority's decision to extend a "comparative fault" mode of analysis to the allocation of fault among solidary tortfeasors is an unnecessary extension of the jurisprudence explaining LSA-C.C. Art. 2323 to an area of law which is controlled instead by the codal articles treating solidary obligations, particularly LSA-C.C. Art. 1804.
Much of the confusion in this area is attributable to the 1987 amendment to LSA-C.C. Art. 2324(B),[1] which limited the liability of a negligent tortfeasor solidarily liable with another tortfeasor to his percentage of fault or 50% of total recoverable damages, whichever was greater. Before 1987, there was no need to quantify a percentage of fault among solidary tortfeasors other than for purposes of contribution among them; the plaintiff could collect 100% of his damages, minus any amount dictated by application of the "comparative fault" rule of LSA-C.C. Art. 2323, from any defendant. After the 1987 amendment, however, it was necessary to quantify the fault of multiple tortfeasors not only for purposes of contribution among the defendants, but also to determine how much a plaintiff could recover from a particular defendant. Comparative fault, properly understood, was not part of this equation; it could reduce the plaintiff's total recovery, but it did not authorize or influence the allocation of fault among solidarily liable defendants.
I therefore submit that both the majority and the dissenting opinions in this case err in the scope which they accord the doctrine of "comparative fault" in Louisiana. If this doctrine is to be applied by analogy to the allocation of fault among codefendants, that may be this Court's prerogative, but it should be recognized that these "comparative fault" *732 principles are being lifted from one context and applied in another. I submit further that this is being done in derogation of the express provisions of the Civil Code which are crafted specifically to deal with the allocation of fault among solidary tortfeasors.
For this reason, I dispute the proposition that this case requires the application of "comparative fault" principles at all. Rather, recourse to our Civil Code provides authority for a more orderly and systematic disposition of this case.

II. Should we "compare" intentional and negligent torts?
As stated above, the answer to the question of whether a negligent plaintiff's recovery should be reduced by damage occasioned by an intentional tortfeasor does not involve any issue of "comparative fault." Rather, in my view, the question is simply whether under LSA-C.C. Art. 1804 we should compare and apportion the "fault" of intentional and negligent tortfeasors.
Whenever the delictual "fault" of a number of persons causes a single injury to a plaintiff, those persons are solidarily bound to repair the damage occasioned by their "fault." LSA-C.C. Arts. 2315 et seq., 1790, 1797. Under LSA-C.C. Art. 1804, "[a]mong solidary obligors, each is liable for his virile portion." "If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor." LSA-C.C. Art. 1804. Thus, LSA-C.C. Art. 1804 requires that any party at "fault" bears responsibility, in accordance with the proportion of their "fault," for the injured party's damages.
The concept of "fault" in our Civil Code is broad, and as Justice Hall's dissent observes, it clearly includes intentional torts. As Planiol puts it, "[i]n most cases[2] the intention to harm is not taken into consideration: it is not upon such intention that the licit or illicit character of the act depends." 2 Planiol, Treatise on Civil Law, § 871(B) (11th ed. 1939). When both an intentional and negligent tortfeasor through their "fault" cause injury to a plaintiff, their liability under the general codal scheme is solidary, and therefore a straightforward application of the first paragraph of LSA-C.C. Art. 1804 would seem to indicate that the proportion of fault attributable to each tortfeasor should be determined.
We note that this first paragraph of LSA-C.C. Art. 1804 is limited by the prefix "[a]mong solidary obligors;" in other words, it only operates to regulate contribution among the tortfeasors. Recovery by an injured plaintiff, the delictual obligee, is treated by LSA-C.C. Art. 1790, which gives the injured plaintiff the right to demand the entire performance, i.e. total recoverable damages, from any party at "fault." In the delictual context the general provision of LSA-C.C. Art. 1790 is in turn modified by LSA-C.C. Art. 2324(B), which provides that in the particular setting of solidary tortfeasors other limitations upon a plaintiff's recovery, e.g. the 50% cap on solidarity, apply. However, LSA-C.C. Art. 2324 does not require or even purport to affect the allocation of fault among solidarily liable tortfeasors. Rather, it merely interposes a limitation upon the total recovery of the plaintiff contemplated by the naked application of LSA-C.C. Art. 1790, a limitation that by legislative design mirrors, but does not directly affect, the allocation of fault among solidarily liable tortfeasors required by the first paragraph of LSA-C.C. Art. 1804.
A strict application of the first paragraph of LSA-C.C. Art. 1804 would therefore seem to mandate that an intentional and a negligent tortfeasor who are solidarily liable for a plaintiff's damage both be assigned a "virile portion" which is in direct proportion to their amount of "fault." When this allocation of fault is then viewed in the context of the plaintiff's recovery, it also seems that the limitation of LSA-C.C. Art. 2324(B) should then, as Justice Hall suggests, be applied to limit or modify the recovery of the plaintiff. However, I posit that this result only obtains until recourse is made to the express provisions *733 of the third paragraph of LSA-C.C. Art. 1804.
III. LSA-C.C. Art. 1804 sets out the controlling legal scheme for addressing the difficulties presented by intentional and negligent tortfeasors in the same case
LSA-C.C. Art. 1804, as aforementioned, is the codal basis for the apportionment of fault among solidarily liable tortfeasors. In our current tort scheme, under LSA-C.C. Art. 1804 a determination of the proportion of fault of each tortfeasor is necessary to establish the "virile portion" of that tortfeasor's obligation. Were we still under the rule of complete solidarity, for a case such as the instant one where the plaintiff is not at fault it would be unnecessary to quantify any defendant's fault for purposes of establishing the amount a plaintiff could recover from any particular defendant. Instead, the quantification of a defendant's fault would only be relevant for a contribution action by, in this case, Southmark against the rapist; in the tort suit by the plaintiff, Southmark as a solidary obligor would be liable for the whole. Since 1987, however, LSA-C.C. Art. 2324(B) has forced the trier-of-fact to quantify the defendants' fault in the plaintiff's suit as well, in order to determine the plaintiff's recovery.
I maintain, however, that LSA-C.C. Art. 1804 must be applied in its entirety before the cap on solidarity set forth in LSA-C.C. Art. 2324(B) becomes operative. When the third paragraph of LSA-C.C. Art. 1804 is applied in this case, the need to apply LSA-C.C. Art. 2324 is obviated.
The third paragraph of LSA-C.C. Art. 1804 states that "[i]f the circumstances giving rise to the solidary obligation concern only one of the obligors, that obligor is liable for the whole to the other obligors who are then considered only as his sureties." As will be more fully explained infra, applicable civilian precepts suggest that a showing of the commission of an intentional tort as opposed to mere negligence should be read to be such a "circumstance." Therefore, negligent tortfeasors who are solidarily liable with the intentional tortfeasor are, by operation of law, transformed into the sureties of the intentional tortfeasor. The limiting provisions of LSA-C.C. 2324(B) accordingly never become operative because that article only addresses solidary tortfeasors; through the third paragraph of LSA-C.C. Art. 1804, however, the basis of the negligent tortfeasor's liability is no longer as a solidarily bound tortfeasor, but rather as a surety to the intentional tortfeasor's obligation to the plaintiff.

A. The application of the third paragraph of LSA-C.C. Art. 1804 to delictual obligations
Prior to the comprehensive codal revision of 1984, the legal principle currently embodied in the third paragraph of LSA-C.C. Art. 1804 was contained in LSA-C.C. Art. 2106 (1870), which provided that "[i]f the affair for which the debt has been contracted in solido, concern only one of the coobligors in solido, that one is liable for the whole debt towards the other codebtors, who, with regard to him, are considered only as his securities." Prior to the 1984 revision of the Civil Code this article existed "without amendment" from our original Civil Code of 1805. Maryland Cas. Co. v. Liberty Mut. Ins. Co., 254 La. 489, 224 So.2d 465, 468 (1969). As is clear from the text of prior C.C. Art. 2106, the earlier incarnation of this provision was expressly addressed only to conventional obligations, i.e. contracts.
In the 1984 revision, however, a number of related articles from the Civil Code of 1870 were grouped into the current LSA-C.C. Art. 1804, which now reads as follows:
Art. 1804. Liability of solidary obligors between themselves
Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor.
A solidary obligor who has rendered the whole performance, though subrogated to the right of the obligee, may claim from the obligors no more than the virile portion of each.

*734 If the circumstances giving rise to the solidary obligation concern only one of the obligors, that obligor is liable for the whole to the other obligors who are then considered only as his sureties.
Clearly this article as a whole is intended to apply to both conventional and delictual obligations, since the specific rules for each are set out in the first paragraph. In addition, the specific language of the earlier codal provision limiting the effect of what is now the third paragraph of LSA-C.C. 1804 to an obligation "which ... has been contracted in solido " has been deleted; the current article now speaks in terms of a "solidary obligation." In light of the scope of the first paragraph of LSA-C.C. Art. 1804, which expressly embraces both conventional and delictual obligations, it can be presumed that the second and third paragraphs, which address themselves to the broad realm of "obligations," apply to delictual obligations as well.[3]
In addition, the former LSA-C.C. Art. 2106 was located in Title IV of Book III of the Civil Code, entitled "conventional obligations." Now, after the revision, new article LSA-C.C. Art. 1804 is located in Title III of Book III, entitled "obligations in general." This is even more evidence that the revised article is intended to apply to delictual as well as conventional obligations, whereas the former LSA-C.C. Art. 2106 was confined solely to conventional obligations.
Given this, what does the third paragraph of LSA-C.C. Art. 1804 mean in the delictual context? If we assume it means nothing, then the amendments and revisions discussed in the preceding paragraphs are rendered meaningless. If we assume it means something, then this article must contemplate a distinction amongst the degrees of "fault," since under our codal scheme "fault" is the sole basis of delictual liability. I agree with the majority's conclusion that intentional wrongdoing differs from negligence not only in degree but in kind, and note that there is support for this distinction in the commentaries of Planiol.[4] Furthermore, I think that neither the first paragraph of LSA-C.C. Art. 1804 nor LSA-C.C. Art. 2324(B) lend themselves readily to the comparison of such "apples and oranges." Rather, it is my view that the Civil Code provides different rules in cases which feature tortfeasors with varying levels of blameworthiness, rules that are designed to do substantial justice, in light of the policies which compel the imposition of delictual responsibility, to all parties involved.
*735 There is also some precedent supporting the view that courts should acknowledge, in certain contexts, gradations of "fault" in the tort indemnity concepts discussed in Dusenbery v. McMoran Exploration Co., 458 So.2d 102 (La.1984). Although it is true that Dusenbery applied only to a strictly liable defendant seeking indemnity from a negligent defendant, the analogy is apt since the basis of Dusenbery was that the strictly liable defendant was "less" at fault than the negligent defendant.[5] The manner of the recovery in Dusenbery, tort indemnity, is practically indistinguishable from the recovery of a surety who has paid the debt of a principal obligor and then may recover from that obligor through subrogation or reimbursement.
I note that I do not read article LSA-C.C. Art. 1804 to mimic or codify Dusenbery; rather, I merely recognize that there is a principle in our jurisprudence for distinguishing degrees of fault and regulating recovery among the tortfeasors. It seems to me sensible to group the vague and rootless doctrine of tort indemnity espoused in Dusenbery (which as an examination of Appalachian Corp., see Note 5, supra, reveals was an importation into our jurisprudence from common law jurisdictions), under the express provisions of LSA-C.C. Art. 1804, i.e. Louisiana codal law. I also observe that the idea of changing the legal relationship of tortfeasors who are guilty of different degrees of fault from that of solidary tortfeasors to some other specie of solidary or vicarious liability (as LSA-C.C. Art. 1804 suggests, suretyship for the negligent tortfeasors who is guilty of a "lesser" degree of fault than the intentional tortfeasor) has been suggested at various times by this Court. See, e.g., Hunt v. City Stores, Inc., 387 So.2d 585, 590 (La.1980) ("In the absence of some greater fault being shown on the part of either, the obligation is solidary").
Furthermore, in the case in which there is an intentional tortfeasor this disposition advances the legislative intent expressed by LSA-C.C. Art. 2324. Paragraph A, which provides that there is 100% solidarity between two intentional tortfeasors who "conspire" to cause injury, reveals that the Legislature intended for intentional tortfeasors to be 100% responsible for damages they cause and that they not be subjected to the 50% limitation (related to the "virile portion" or proportion of fault discussed in LSA-C.C. Art. 1804) upon the solidarity of negligent tortfeasors found in Paragraph B. If we compare intentional and negligent tortfeasors without distinction, as several of the dissenting opinions seem to indicate we should, this legislative directive is undermined. The application of the third paragraph of LSA-C.C. Art. 1804, as interpreted herein, eliminates this problem by ensuring that a case presenting a mixture of intentional and negligent tortfeasors never gets to LSA-C.C. Art. 2324. LSA-C.C. Art. 2324 is meant to be a limitation upon solidarity in tort; if negligent tortfeasors are viewed as sureties of the intentional tortfeasors, LSA-C.C. Art. 2324 would not apply to limit their obligation because the amount that they owe would be based not upon their own delictual responsibility but solely upon the obligation of the principal obligor, i.e. the intentional tortfeasor.

B. Application of these principles to this case
In Great S.W. Fire Ins. v. CNA Ins., 557 So.2d 966, 969 (La.1990), this Court discussed how LSA-C.C. Art. 1804, in conjunction with other relevant codal articles, works in a contractual context:
In general, the solidary obligor who extinguishes the debt is entitled to a right of contribution against his codebtors, but must divide his action so that he can demand from each one of them no more than his virile portion. La.C.C. art. 1804. There are exceptions to the rule, however. *736 If the obligation arises from a contract or quasi-contract, the circumstances or agreement by the parties may cause the court to apportion liability differently. It may also appear that one of the obligors should be liable for the whole debt because he is to be considered as the principal obligor. La. C.C. art. 1796. See also Levasseur, supra, at 103-104. In such a case the other obligors will stand as sureties for the principal obligor. La.C.C. arts. 1804, 3035, 3037.
The transposition of this scheme to a delictual setting can be illustrated by the facts of the instant case.
In this case, there is an intentional tortfeasor, the rapist, and a negligent tortfeasor, Southmark, the liability of both being a proper subject for the consideration of the trier-of-fact. The nature of the obligation owed by each, as previously discussed, is different. Therefore, upon a finding of liability based upon different degrees of delictual "fault," by operation of the third paragraph of LSA-C.C. Art. 1804 the treatment of Southmark's liability should no longer fall under the delictual articles, e.g. the 50% cap on solidarity in LSA-C.C. Art. 2324, but rather under the suretyship articles. In other words, the basis for the plaintiff's recovery against Southmark is no longer founded solely in tort; rather, Southmark is transformed by operation of law into a surety of the rapist's obligation towards the plaintiff, and the suretyship articles provide the mechanism for the plaintiff's recovery from Southmark and Southmark's recourse against the intentional tortfeasor.
Under this approach, the result in this case is the same; Southmark owes 100% of the obligation owed by the intentional tortfeasor as surety to that debt. Southmark, having paid that debt, enjoys all of the rights of reimbursement and subrogation against the intentional tortfeasor, should he ever be located, sued, and cast in judgment, that a surety who has performed the principal obligation has against a principal obligor under the suretyship articles. There is no matter of "comparing" fault or determining whether a party at fault should be allocated blame; comparative fault, properly understood and applied, i.e. a comparison of plaintiff and defendant(s) fault, is a matter reserved for assessing relative blame between the plaintiff and the intentional tortfeasor. Since Southmark through LSA-C.C. Art. 1804 is only liable as surety for the intentional tortfeasor, it may not urge a comparison of its fault to the plaintiff; rather, the derivative nature of Southmark's liability under the applicable codal articles instructs that it is the comparison of the fault of the intentional tortfeasor and the plaintiff, if such a comparison is warranted by an application of "comparative fault" principles, that is proper. If the rapist is cast for the 100% of damages,[6] Southmark as surety (assuming negligence on Southmark's behalf, which is the case here) has to pay, and its recourse against the rapist is under the suretyship articles.[7]
Thus, under the facts of this case LSA-C.C. Art. 2324 never comes into play because under our analysis only the intentional tortfeasor ever becomes amenable to the application of LSA-C.C. Art. 2324, the negligent tortfeasor having been removed from its operation and relegated to treatment under the suretyship articles by the third paragraph of LSA-C.C. Art. 1804. That is because prior to the application of the provisions of LSA-C.C. *737 Art. 2324(B), the third paragraph of LSA-C.C. Art. 1804 mandates that Southmark's quasi-delictual liability be treated not under the delictual articles, but rather under the suretyship articles. There is therefore no need to allocate fault among the tortfeasors; Southmark's liability, although quasi-delictual in origin, is derivative of the rapist's delictual liability, see Note 4, supra, and since the rapist is an intentional tortfeasor and the plaintiff is not at fault the rapist is responsible for 100% of the plaintiff's damages.[8]

IV. Conclusion
In this case, the plaintiff was not at fault; therefore, the liability of the tortfeasors should be 100%. Furthermore, the application of LSA-C.C. Art. 1804, particularly its third paragraph, leads me to the conclusion that in this case the basis of Southmark's liability to the plaintiff should be in its role as surety, by operation of law, to the intentional tortfeasor/rapist. Accordingly, the plaintiff should be able to recover 100% of her damages from the negligent tortfeasor as surety to the delictual obligation of the intentional tortfeasor. Once that recovery has occurred, the negligent tortfeasor is able to seek whatever remedies the suretyship articles afford him against the principal obligor/intentional tortfeasor.
As this result indicates, the system that I make recourse to does not impair the recovery of the plaintiff in any way; thus, I concur in the result on original hearing and concur in the denial of rehearing. This approach only has a substantial application to situations where there exist different degrees of fault, e.g. intentional tort v. negligence v. strict liability, situations which have been treated often, albeit less than systematically, in our jurisprudence.
In this particular case although the rapist bears complete blame for his act, a conclusion which is at least as deeply ensconced in common sense as it is in legal principle, nevertheless the injured party is entitled to collect 100% of her damages from the negligent tortfeasor. Furthermore, this system also ties the hazy notion of "tort indemnity" to a solid codal basis, reserving to the negligent tortfeasor who is cast in judgment extensive recovery rights under the suretyship articles against the intentional tortfeasor.
It should be stated that the approach endorsed herein would not impact at all the large majority of cases where fault is similar in kind, albeit possibly in different proportions, e.g. several negligent tortfeasors. Shifting our analysis to the general obligations articles and away from the exhausted language of LSA-C.C. Arts. 2323 and 2324 would, however, allow this Court to stop treating problems such as those presented in this case on an ad hoc basis and allow more ready recourse to the time-honored and considered legal system of our Civil Code.
Thus, for the reasons presented herein, I respectfully concur in the denial of the application for rehearing.

ON REHEARING
WATSON, Justice, concurring in denial of rehearing.
I concur to emphasize my disagreement with the majority's determination that the trial court must decide on a case-by-case basis whether intentional and negligent fault should be compared.
As I stated in my original concurrence, intentional fault cannot be logically compared with negligent fault or the fault of the injured victim.
I respectfully concur in denial of rehearing.
NOTES
[*] Justice Revius O. Ortique, Jr., retired, participating in the decision by assignment, the case having been argued prior to his retirement.

Justice Marcus not on the panel. Rule IV, Part 2, § 3. Judge Charles A. Marvin, Chief Judge, Court of Appeal, Second Circuit, sitting in place of Dennis, J.
[1] La.Code Civ.Pro. art. 1812(C)(2), provides:

C. In cases to recover damages for injury, death, or loss, the court may submit to the jury special written questions inquiring as to: (2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
[2] The relevant interrogatories and the jury's responses are follows:

INTERROGATORY NO. 1:
With respect to the defendant, Southmark Management Corporation: Was Southmark Management Corporation at fault with respect to the incident and did the fault produce or substantially contribute to the incident?
Yes [9] No [3]
INTERROGATORY NO. 2:
With respect to the plaintiff, Christi Veazey: Was the plaintiff, Christi Veazey, at fault with respect to the incident and did that fault produce or substantially contribute to the incident?
Yes [0] No [12]
INTERROGATORY NO. 3:
What percentage of Ms. Veazey's damages do you find were caused by Southmark Management Corporation, if any? What percentage of Ms. Veazey's damages should be reduced by the fault of Ms. Veazey, if any?
Southmark Management Corporation [60%]
Ms. Christi Veazey [40%]
(Percentage must total 100%)
[3] Act 331 of 1984 (effective January 1, 1985), which rewrote the Civil Code provisions on obligations, moved the rules regarding contribution contained in former La.C.C. art. 2103 to La.C.C. arts. 1804 and 1805. The official revision comments to those articles indicate that the revision did not change the law. Cole v. Celotex, 599 So.2d 1058, 1068 n. 31 (La.1992).
[4] Act 534 of 1983 moved the contents of former La.Code Civ.Pro. art. 1811 to La.Code Civ.Pro. art. 1812(C) and added the phrase "whether party or not" to Article 1812(C)(2) to clarify that nonparties' fault may be considered. See Official Revision Comments to La.Code Civ.Pro. art. 1812. La.Code Civ.Pro. art. 1917, which deals with nonjury cases, cross references La.Code Civ. Pro. art. 1812(C), providing that "the court shall make specific findings that shall include those matters to which reference is made in Paragraph C of Article 1812 of the Code."
[5] La.C.C. art. 1804 provides that "among solidary obligors, each is liable for his virile share" and when that "obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor." The comments note that this approach is consistent with the theory of comparative negligence.
[6] La.C.C. art. 2323 provides:

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
[7] La.C.C. art. 2315 provides, in pertinent part, as follows:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. (Emphasis supplied).
[8] A "logomachy" is "a dispute over or about words." Webster's Ninth New Collegiate Dictionary (1990).
[9] As noted in Hebert, supra, the majority view among courts in other jurisdictions that have addressed this issue is that comparative fault is inapplicable to intentional torts. See A. Schwartz, Applicability of Comparative Negligence Principles to Intentional Torts, 18 A.L.R.5th 525, 532 (1994); H. Woods, Comparative Fault § 7.1 (2d Ed.1987); V. Schwartz, Comparative Negligence §§ 5.1 and 5.2 (2d Ed.1986). Speaking on this issue, the Uniform Comparative Fault Act generally follows the majority position, stating in the comments that "[t]he Act does not include intentional torts [because] statutes and decisions have not applied the comparative fault principle to them. But a court determining that the general principle should apply at common law to a case before it of an intentional tort is not precluded from that holding by the Act." Appendix, Uniform Comparative Fault Act (1979), 40 La.L.Rev. 419, 422 (1980).
[10] The lower courts correctly determined that the plaintiff herein was free from fault. We therefore need not, and do not, express any opinion in this case as to whether, or in what situations, if any, victim fault should be compared to the fault of an intentional tortfeasor.
[11] See, e.g., Pamela B. v. Hayden, et al., 25 Cal.App.4th 785, 31 Cal.Rptr.2d 147 (Cal.App.2d Dist.) writ granted, 33 Cal.Rptr.2d 568, 880 P.2d 112 (Cal.1994). In Pamela B., the plaintiff was raped in the garage of her apartment building. Plaintiff sued her landlord and the property management company in charge of her building, contending their inadequate attempts to provide a secure garage caused her rape. California law requires comparison of intentional torts and negligence, and the jury in this case awarded $1.2 million to plaintiff, attributing 95% of the fault to the landlord and management company, 4% to the man who raped her, and 1% to the rapist's accomplice who aided and abetted the rapist!

The appellate court reversed and remanded the case for a new trial on apportionment of damages, noting that "it is reasonable to assume the jury will apportion fault so that the one who acted intentionally should bear `most if not all the blame'." (Citing Knott v. State of California, (1994) 23 Cal.App.4th 210, 234, 28 Cal.Rptr.2d 514). This proposition prompted one of the appellate court judges to note in his concurrence:
... But what allocation could be upheld on appeal? Is it not per se unreasonable to assess negligence at a higher rate than intentional, wanton criminal activity? Although the result would not be as shocking as what we have here, could we justify holding the owner and manager even 51 percent responsible?
It is ironic that plaintiff suffers reversal because her extremely able counsel was able to get such a result from the jury. Had the jury, for example, assessed the criminals at any higher percentage than the tortfeasors, the verdict would be easier to uphold. What is a trial lawyer to do? The more persuasive one is, the less likely the result will survive appeal. This turns the concept of advocacy on its ear. What kind of credibility does all this lend to the justice system?
Pamela B., 25 Cal.App.4th at 806, 31 Cal.Rptr.2d at 161 (Ortega, J., concurring).
The questions raised by the concurring judge in the Pamela B. case highlight the inherent difficulties advocates of comparing the fault of an intentional tortfeasor and a negligent tortfeasor have in addressing the common sense question: "in such a comparison, how can a rapist (or virtually any intentional tortfeasor) not be 100% liable for his actions?" The common sense answer, i.e., that the intentional tortfeasor is, by definition, always 100% liable for his intentional acts which have caused damages, simply serves to reinforce Dean Prosser's assessment that intentional wrongdoing "differs from negligence not only in degree but in kind...."
[12] While we are aware of the argument which has been advanced by at least one court and several commentators that the application of comparative fault principles in the context of strict liability is conceptually more difficult than application of such principles where fault is based on intentional wrongdoing and negligence, see Blazovic, supra; Dear & Zipperstein, supra at 2, this argument is based on the premise that strict liability torts are premised on a tortfeasor's status or relationship to the property or thing, and not on actual fault. Hence, the argument goes, if it is possible to compare the "fault" of one who has no actual fault (the strictly liable party) and one who does have actual fault (the negligent party), it certainly is possible to compare the "fault" of two parties (the intentional tortfeasor and a negligent tortfeasor) whose liability is based entirely on their actual fault.

This line of reasoning ignores the fact that while strict liability is based on the tortfeasor's status or relationship to the property or thing which caused the harm, determinations as to both liability and comparative fault are made on the basis of the strictly liable defendant's imputed knowledge of the of the risk, which in turn, is based on the party's status or relationship to the property or object which produced the harm. See Kent v. Gulf States Utilities Co., 418 So.2d 493, 497-98 (La.1982) ("Accordingly, in a strict liability case ... the standard for determining liability is to presume the owner's knowledge of the risk presented ... and then to determine the reasonableness (according to traditional notions of blameworthiness) of the owner's conduct, in light of that presumed knowledge." [Emphasis in original]). As was stated in a concurring opinion in Kent, supra: "In strict liability, however, knowledge of the condition of the product is imputed to the defendant before the balancing test or negligence test is applied." Id. at 501 (Dennis J., concurring) (Emphasis added). See also T. Galligan, Jr., Strict Liability in Action: The Truncated Learned Hand Formula, 52 La. L.Rev. 323, 329 (1991) ("Lemmon's approach [in Kent, supra] reminds us that strict liability is negligence without knowledge." [Emphasis added]).
Therefore, in a case where comparative fault principles are being applied between the defendant whose liability is based on negligence and the defendant whose liability is based on strict liability, after the imputation of the knowledge element to the strictly liable defendant the determination being made as to the defendants' comparative fault is effectively one of negligence versus negligence. Such a comparison, in our view, is conceptually much simpler than a comparison of negligence based fault and fault based on an intentional act.
[13] As occurred in the instant case, the procedural mechanism by which a party may request submission to the jury of a special interrogatory regarding phantom tortfeasor fault is set forth in La.Code Civ.Pro. art. 1812(C)(2). See supra, note 1. Though we are aware of our prior holdings construing La.Code Civ.Pro. art. 1812(C), see, e.g., Gauthier v. O'Brien, 618 So.2d 825, 831 (La.1993) (holding that "[f]ailure to submit a special jury interrogatory to the jury to determine the fault, if any, of a third party constitutes error"); Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1309 (La.1984) (holding that "[w]hile La.C.C.P. art. 1812C provides that the court may (unless waived by all parties) submit special written questions to the jury, the apparent intent is that the court in such circumstances is required to submit the questions"), those cases involved comparisons of negligence. Hence, Gauthier and Lemire mandate the submission of such special interrogatory, when appropriate.

Submission of such a special interrogatory becomes appropriate in a negligence case when evidence supporting a finding of fault on the part of a phantom tortfeasor is presented. Brock v. Winn Dixie Louisiana, Inc., 617 So.2d 1234, 1238 (La.App. 3d Cir.), writ denied, 620 So.2d 848 (La.1993) (citing Devereux v. Allstate Ins. Co., 557 So.2d 1091 (La.App.2d Cir.1990)). When such evidence exists, the trial court's refusal to submit such special interrogatory to the jury to permit the allocation of fault to the phantom tortfeasor is erroneous. Gauthier, 618 So.2d at 831. However, submission of such an interrogatory in a strict liability case or an intentional tort case only becomes appropriate where the trial court has determined that the public policy bases discussed herein are not present.
[1] By "phantom tortfeasor" is meant "anyone whose fault may have contributed to the plaintiff's injuries but who has neither settled with the plaintiff and been released from liability nor been made a party to the lawsuit." D. Robertson, Solidary Liability in Tort: Understanding Gauthier and Touchard, Who Pays How Much?, Part 2, 41 La.Bar J. 334 (1993).
[2] LSA-C.C.P. Art. 1812(C)(2) provides as follows:

C. In cases to recover damages for injury, death, or loss, the court may submit to the jury special written questions inquiring as to:
* * * * * *
(2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage. (Emphasis supplied).
[3] Solidary liability is the civilian equivalent to the common law joint and several liability concept. Touchard v. Williams, 617 So.2d 885, 889 (La.1993).
[4] LSA-C.C. Art. 2324, in its current form, provides in pertinent part as follows:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
[5] I note here my agreement with the quoted statements from Touchard that a judgment creditor is not precluded from 100% recovery from tortfeasors who commit "an intentional or wilful act" under paragraph A of LSA-C.C. art. 2324. Although couched in terms of solidary liability of a person who conspires with another to commit an intentional act, the underlying essence and policy of the code article is that a person who commits an intentional act is liable for the full extent of damage caused by the act. Thus, the rapist in this case, if named as a defendant, would be solidarily liable for 100% of plaintiff's damages, although the landlord's solidary liability would be limited to 50%, assuming less than 50% fault on the part of the landlord. See, in addition to Touchard, Johnston v. Fontana, 610 So.2d 1119 (La.App. 2d Cir.1992), writ denied 618 So.2d 407 (La.1993), and Thomas C. Galligan, Jr., Article 2324. The Discombobulating State of Solidarity In Post Tort Reform Louisiana, 54 La.L.Rev. 551, 560-562 (1994).
[6] I realize that there will be limited instances in which the application of comparative fault principles to an intentional tort case will be unwarranted, particularly when comparing plaintiff fault with defendant fault, and note merely as an example conversion cases involving defendants engaging in self-help measures. Broussard v. Lovelace, 610 So.2d 159 (La.App. 3d Cir.1992), writ denied, 615 So.2d 343 (La.1993) (declining to apply comparative fault to conversion case); Hebert v. First Guaranty Bank, 493 So.2d 150 (La.App. 1st Cir.1986) (same). Nonetheless, I view these cases as limited exceptions which can perhaps be resolved on other grounds such as by finding, under duty-risk analysis, a duty lacking. R. Hallack, Comment, Louisiana's Comparative Fault Doctrine and the Mitigation of Damages in the Intentional Tort of Assault and Battery, 15 So.U.L.Rev. 111 (1988).
[1] The decision Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985) did not create an exception to the application of comparative fault. Although the date of the accident does not appear in the Bell opinion, the accident in Bell occurred before the effective date of comparative fault, and the plaintiff would have recovered under pre-comparative fault law anyway. Therefore, any pronouncements on comparative fault in Bell were dicta. Moreover, any decision to apply exceptions will more likely come by a refusal to compare victim negligence in a particularly harsh situation (as in Bell), rather than in a comparison of multiple tortfeasor fault (as in the present case).
[2] Prior to the 1987 amendment to La.Civ.Code art. 2324, the fault of each tortfeasor could have been allocated (for contribution purposes), and the blameless tort victim could have collected one hundred percent from either. Under present law, recovery against a solidary obligor who is less than fifty percent at fault is reduced to fifty percent of the tort victim's damages. Touchard v. Williams, 617 So.2d 885 (La.1993).
[3] Comparison of fault between tortfeasors can be difficult in many circumstances, as when the fault of one occurred at a time remote from another's more proximate fault that immediately precipitated the damages. Recognizing that the fault of both tortfeasors (the proximate and the remote) should be considered by the factfinder caused Louisiana to replace proximate cause analysis with duty-risk analysis. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962), Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970). Similarly in the present case, the fault of two tortfeasors combined to produce the victim's single injury. Indeed, the apartment manager's fault was more remote and less causative in effect, but must be recognized in order to complete the fault picture. Once this concept of dual causative fault is acknowledged, the legislative pronouncement on solidarity takes over and requires reduction of the victim's recovery.
[4] One cannot overemphasize the fact that this case involves a comparison of fault between tortfeasors and not a comparison of a tortfeasor's fault with a tort victim's contributory negligence. There arguably may be much more justification for making an exception to application of comparative fault by disregarding the victim's contributory negligence under extreme circumstances than by disregarding the fault of one of several tortfeasors.
[1] Eight years before, in 1979, LSA-C.C. Arts. 2323 and 2324 were amended to provide for "comparative fault" as it has come to be called. From 1979 to 1987, LSA-C.C. Art. 2324 provided that all tortfeasors were solidarily liable, but that the debt which they owed was reducible by the proportion of the plaintiff's comparative negligence under LSA-C.C. Art. 2323. In 1984, LSA-C.C. Art. 1804 was amended to its current form, see Text infra, and Comment (b) notes that the designation that each tortfeasor's virile share be according to the "proportion of his fault" was intended to make the solidarity articles "consistent with the idea of comparative negligence." In other words, it was the amendment to LSA-C.C. Art. 1804 which created the need for the trier-of-fact to assess a proportion of blame to various defendants, and that change was implemented to create a similar scheme to the comparison of fault between plaintiff and defendant mandated by LSA-C.C. Art. 2323. Thus, the practice of assessing proportionate blame to defendants was influenced, but not caused, by the Legislature's adoption of comparative fault. This is significant, because what had formerly been an inter-defendant matter directly affected the recovery of a plaintiff after the 1987 amendment to LSA-C.C. Art. 2324, discussed infra.
[2] One of these cases, which treats divisions within the general aegis of "fault," will be discussed infra.
[3] The first paragraph of LSA-C.C. Art. 1804 contains, as noted supra, the phrase "Among solidary obligors," limiting the effect of that paragraph in the delictual context to solidarily liable tortfeasors. Contrast the second and third paragraphs of LSA-C.C. Art. 1804, which do not contain this limitation. Furthermore, I note that the deletion of the phrase "with regard to him" found in old C.C. Art. 2106 from the revised article LSA-C.C. Art. 1804 allows the third paragraph of this article to be read as effective against third parties, and not just among the various sureties of the principal obligor. Even were this not the case however, the allocation of fault among delictual obligors under LSA-C.C. Art. 1804, including its third paragraph, is tacitly reflected in the system of tort recovery established by LSA-C.C. Art. 2324, given the latter article's contemplated requirement of delictual fault being quantified and allocated among solidarily liable defendants in accordance with the "comparative fault" system. See Note 1, supra.
[4] The important thing therefore is to draw up the table of legal obligations protected by article 1382 [the French equivalent to LSA-C.C. Art. 2315], but that task is quite delicate; it does not suffice to say that it is forbidden "to harm another;" it is necessary also to indicate the forms under which such obligation is encountered. We can recognize a quadruple object:

(1) To abstain from any violence towards things or persons;
(2) To abstain from any fraud, that is to say from any act which deceives another;
(3) To abstain from acts which require a certain force or a certain ability, which one does not possess in the required degree;
(4) To exercise a sufficient surveillance over dangerous things which one possesses or over the persons of whom one has the guardianship (children, insane persons, etc.).
The first two obligations are absolute: violence and fraud are reprobated in themselves, and those who employ them are necessarily at fault and responsible. These are the ones which correspond to the class of delits properly so-called or intentional damage "dolo." In the last two categories, the person responsible has not acted with "dolo," but only with "culpa;" his conduct is entitled to a certain evaluation because the fault committed is susceptible of degrees.
Planiol, supra, § 865.
[5] This argument is even more salient if Appalachian Corp. v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922), which was cited by Dusenbery as precedent for tort indemnity, is examined. Although Dusenbery suggests that the basis of the tort indemnitee's liability in Appalachian Corp. was some form of strict liability, the case reveals that both tortfeasors were found liable under a negligence theory (due perhaps to the state of the law regarding strict liability in 1922). If tort indemnity can apply in a comparison of the actions of two dissimilarly negligent tortfeasors, it seems a fortiori that the same general approach should apply to the allocation of fault between an intentional and a negligent tortfeasor.
[6] If under an application of "comparative fault" a plaintiff is found to be at fault, the resulting diminution in the obligation owed by the intentional tortfeasor is of course effective for the negligent tortfeasor as well. This is because under the fundamental principles of both solidarity and suretyship, each owes the same obligation. Thus, were a plaintiff found to be 10% at fault in relation to an intentional tortfeasor, that plaintiff could recover 90% of his or her recoverable damages from a negligent defendant.
[7] This system actually provides for enhanced recoveries by plaintiffs (since the only application of comparative fault would be between intentional tortfeasors and negligent plaintiffs, and the policy reasons noted by the Court in its majority opinion limiting the application of comparative fault would certainly apply in this context). However, it also reserves to negligent tortfeasors greater rights of "contribution" against the intentional tortfeasor since recovery is not to be based upon a "virile portion" related to an allocated proportion of fault, but rather to the subrogation and/or reimbursement principles of the suretyship articles. In other words, a negligent tortfeasor can recover 100% of what he paid to the plaintiff from an intentional tortfeasor, at least as a matter of legal principle.
[8] In cases where there is more than one intentional tortfeasor, LSA-C.C. Art. 2324(A) and its rule of 100% solidarity for intentional tortfeasors is applicable, with all negligent tortfeasors being sureties to that obligation.