I,GASKINS, J.
This case involves the sale of stolen cattle. The trial court allowed recovery to those who were damaged by the wrongful conduct of the cattle seller, but also applied the principles of comparative fault to reduce their recovery. Most of the parties have appealed the trial court judgment or have answered the appeal. For the following reasons, we reverse in part and affirm in part the trial court judgment.
FACTS
For a number of years, Danny Smith and Charles Glasscock, Sr. had a partnership known as McDade Cattle Company, which engaged in raising cattle in Bossier Parish. In 1992, Mr. Glasscock died and his children, Robert Edward “R.E.” Glas-scock, Charles W. Glasscock, Jr., and Dorothy Ann Glasscock Dupree, were substituted as partners. R.E. Glasscock, a resident of Houston, was mainly involved in managing the partnership with Smith. He also engaged in a cattle operation with Smith separate from the McDade Cattle Company. This operation was conducted at Shady Grove Farm, located on property owned by the Glasscock family in Bossier Parish. Smith leased the Shady Grove property from the Glas-scock family for $12,000, and was paid by Mr. Glasscock for the use of this property in their enterprise. Under their arrangement, Mr. Glasscock provided all the money and property for a cow/calf operation and Mr. Smith supplied the labor. The profits were then divided between the two.
In 1994, Danny Smith told B.L. Little-ton, an out-of-state rancher, that he and R.E. Glasscock owned 250 head of Bran-gus cattle that were for sale. Actually, Glasscock was the sole owner of the cattle which were at the Shady Grove farm. These cattle were not connected with the McDade Cattle Company. After Littleton provided bull semen to artificially inseminate the cows, he then purchased the 200 cows that were pregnant. This sale occurred on August 1, 1994. | ¡.Littleton paid $150,000 for the cows. Smith asked for two checks, one for $75,000 to Danny Smith Farms and the other for $75,000 to R.E. Glasscock. However, it appears that Smith gave Glasscock the entire proceeds from the sale. When the cows began calving earlier than expected, Littleton and Smith entered into an agreement whereby the cattle were to stay at the Shady Grove farm from November 1, 1994 until February 28, 1995. In exchange for pasturing the cattle, Littleton paid Smith $11,000. Shortly after the purchase of the cows in August 1994, Littleton re-branded them with his “BL” brand, which is registered in Texas. He also placed ear tags on the cows, sequentially numbered from one to two hundred.
At about this time, Smith began experiencing financial difficulties caused largely by a gambling problem. Without Little-ton’s knowledge or approval, Smith began selling Littleton’s cows at Livestock Producers, Inc., (LPI) an auction business run by Ronnie Stratton. A total of 126 cows, some with their calves, were disposed of by Smith. This was accomplished in several separate sales, beginning in September 1994. In January 1995, Smith contacted Stratton, anxious to quickly dispose of the remaining 74 cows. On January 16, 1995, Stratton personally purchased the cows and was reimbursed by LPI, which immediately resold them to Don Sonnier. The cows were taken to Sonnier’s farm.
On February 16, 1995, Littleton received an anonymous phone call at his office in Hot Springs, Arkansas, that the cows were *540 gone and that Danny Smith had disappeared. A criminal investigation ensued and Danny Smith was arrested and charged with theft. The Bossier Parish Sheriffs Office determined that the 74 cows should remain on the Sonnier farm until the matter was settled. When the ownership of the cows was called into question, LPI refunded Sonnier’s purchase price. Then, the two civil suits at issue here were instituted.
hOn February 23, 1995, LPI and Ronnie Stratton filed a petition for a temporary restraining order, injunction, declaratory judgment, or in the alternative, money damages. LPI claimed to be the owner of the 74 cows purchased from Smith on January 16, 1995. LPI sought an injunction prohibiting the removal of the cattle until ownership could be determined by the court. In the alternative, LPI and Strat-ton sought money damages if they should be determined not to be the owners of the cattle or if the cows were encumbered with a priming security interest. Named as defendants were B.L. Littleton, Danny Smith d/b/a Smith Farms, McDade Cattle Company and R.E. Glasscock, individually.
Littleton answered and filed a cross-claim against Danny Smith d/b/a Smith Farms, and against McDade Cattle Company, asserting that Smith and McDade fraudulently sold the 200 cows he had previously purchased. He sought to recover the $150,000 purchase price as well as expenses incurred in the keeping of the cattle. He also asserted his ownership right to the 74 cows remaining with Sonnier and sought reimbursement from LPI and Stratton for the other cows that were disposed of at auction.
The Glasscocks and McDade Cattle Company answered, claiming that the partnership with Smith was dissolved. They contended that LPI did not buy the 74 cows from McDade and that McDade got no money from that sale.
On February 6,1996, B.L. Littleton filed suit against LPI, Ronnie Stratton, Danny Smith, McDade Cattle Company as well as R.E. Glasscock, individually. Littleton alleged that LPI and Ronnie Stratton sold the cows without checking their ownership, even though the cows had a new and unfamiliar brand and even though Danny Smith was not a regular customer of the auction. He further alleged that Smith and Glasscock were partners in McDade Cattle Company and that they 14wrongfully received the proceeds from the sale of the cattle and should return the money to him.
On May 8, 1997, Donald E. Sonnier filed a petition of intervention naming as defendants LPI, Ronnie Stratton, B.L. Littleton, Danny Smith d/b/a Smith Farms, McDade Cattle Company and the Glasscocks, seeking to recover expenses for the 74 cows left in Sonnier’s care. He later amended his petition of intervention to add as a defendant Larry Deen, Bossier Parish Sheriff, asserting that the sheriffs office determined that the cows should remain on Mr. Sonnier’s farm. The claim against the Bossier Parish sheriff was severed from these proceedings at trial because it had not been filed in time for the sheriffs office to respond.
Trial Court Judgment
The two suits were consolidated and the trial was held on June 10, October 10 and October 15, 1997. During the trial, the court entered an order dissolving the restraining orders and injunctions and authorizing release of the 74 cows to B.L. Littleton. On May 7, 1998, the trial court issued its original opinion in this case. It found that R.E. Glasscock and Danny Smith occasionally purchased cattle for a cow-calf operation in a business venture separate from McDade Cattle Company. The court found that Glasscock received the entire $150,000 that Littleton paid for the 200 cows. According to the court, Ronnie Stratton and LPI believed that Smith was acting in his capacity as partner of either the Smith-Glasscock venture or the McDade Cattle Company when he sought to sell cattle at the auction. The court also found that when the ownership *541 of the 74 cows purchased by Stratton for LPI and sold to Sonnier came into dispute, Sonnier’s purchase price was refunded.
|sThe court noted that during the time Sonnier kept the 74 cows, some calves were born, were sold and $39,000 was invested in a certificate of deposit. The court awarded Sonnier this money and any interest that had accumulated in satisfaction of his claim for caring for the cattle until they were released to Littleton.
Regarding the other claims in this ease, the court found that, because these were suits requesting monetary damages, the principles of comparative fault applied. The court then considered the disputed claims of Smith, Glasscock, Littleton, and Stratton. The court found that the fact that Glasscock got two checks for the sale of the cattle to Littleton, one of which was made out to Smith, shows that Glasscock knew that Smith was portraying to others that he had authority to buy and sell cattle for the Glasscock/Smith partnership.
The court determined that Littleton bought 200 cows and then left them in Bossier Parish for a long time without adequately securing them.
The court found that Stratton and LPI were good faith purchasers of the 74 cows from Smith, but that Stratton should have been more careful in examining the brands and in getting more information and corroboration of their ownership. The court found that Stratton was entitled to recover his purchase price for the cows, but that he was 40% at fault, therefore he was entitled to recover only $32,190 of his original purchase price of $53,650. The court found that Smith and Glasscock were solidarity hable to Stratton for $32,190. The court then found that Stratton was entitled to a judgment of $53,650 from Smith.
Regarding Littleton, the court found that he lost all the cows except those retrieved from Sonnier and found that he was entitled to recover for the lost cows. One hundred twenty-six cows were sold at auction and three died in the care of | ^Sonnier. In addition, Littleton was ordered to refund the purchase price of the 74 cows to Stratton.
The parties were confused by the opinion and could not agree on the judgment. A hearing was held on July 9, 1998 to clarify the opinion. On July 28, 1998, the trial, court filed a supplemental opinion. The court then set forth that it allocated fault in the following amounts: 40% to Stratton, 30% to Glasscock, and 30% to Littleton. The court stated that the percentage of fault attributable to Smith was not allocated pursuant to Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94), 650 So.2d 712, dealing with the assessment of fault in cases involving both intentional torts and negligence.[1] In Veazey, the court held that negligent tort-feasors should not be allowed to reduce their fault, pursuant to comparative fault law, by the intentional fault of another that they had a duty to prevent. However, Smith was found to be liable for the losses incurred by all parties involved in this case.
On September 9, 1998, the trial court entered judgment awarding the $39,000 certificate of deposit, with interest, to Son-nier. Littleton was ordered to pay Strat-ton $16,095, Glasscock was to pay Stratton $16,095, Smith was to pay Stratton $53,-650, Smith was to pay Littleton $151,845, and Smith was to pay Glasscock $16,095. Ownership of the remaining 74 cows was awarded to Littleton.[2] Littleton, R.E. Glasscock and Don Sonnier appealed the trial court judgment. LPI and Ronnie Stratton answered the appeal.
*542 |7THE APPEAL
B.L. Littleton appealed the trial court judgment arguing numerous assignments of error. He contends that LPI and Strat-ton are completely liable for the loss of the cows. Littleton urges that the trial court erred in assessing any degree of fault to him for the loss of the cows. Littleton asserts that LPI and Stratton are not good faith purchasers of the 74 cows remaining at Shady Grove farm. Therefore, Little-ton should not have to reimburse them for the price paid to Smith for those cows. Littleton argues that Glasscock should be held liable for Littleton’s loss because Smith was either a partner or an agent for Glasscock. Littleton contends that the award to Sonnier for keeping the cows was excessive and that Littleton should not have to pay the keeper’s fee.
LPI and Stratton argue that the trial court erred in applying the theory of comparative fault, an affirmative defense, not pled or argued by any of the parties. LPI and Stratton also argue that the trial court erred in assessing any percentage of fault to them.
R.E. Glasscock argues the trial court erred in finding any degree of fault attributable to him.
Don Sonnier argues that the trial court erred in making an excessively low keeper’s fee to him for caring for the 74 remaining cattle for an extended period of time.
STANDARD OF REVIEW
The decision reached by the trial court in this case rests upon numerous factual determinations. The Louisiana Supreme Court has developed a two-part test for reversing a fact finder’s determination. The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact, and then the appellate court must further determine that the record | Sestablishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120 (La.1987). Said another way, findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989); Brister v. Continental Insurance Company, 30,429 (La.App.2d Cir.4/8/98), 712 So.2d 177. Applying this standard of review, we find that the trial court was manifestly erroneous or clearly wrong in a number of the factual determinations reached.
AUCTIONEER’S LIABILITY
Littleton contends the trial court erred in finding that LPI and Ronnie Stratton were not completely liable for the sale of Littleton’s cows. According to Lit-tleton, LPI and Stratton were negligent in taking the 126 cows for sale at the auction when Smith was not a regular customer, the cows had a new and unfamiliar brand and they all had new ear tags. Littleton contends that the failure of LPI and Strat-ton to make any inquiry as to the ownership of the cattle was negligent and therefore they are liable for the loss. Littleton also argues that, although there is no Louisiana jurisprudence on point, other jurisdictions hold that an auction house is the agent of the seller and lack of knowledge of the seller’s wrongful conversion is immaterial. The agent stands in the shoes of the seller. Because the auction barn became the agent for a dishonest seller, it must stand the loss. Therefore, Littleton contends that LPI and Stratton are liable to him for the value of the 126 cows sold at auction.
LPI and Stratton argue that all requirements were complied with for a legal cattle auction in the State of Louisiana. They checked for liens and the brands were checked against the Louisiana catalog for brands. Further, they contend that Smith was known as a reputable cattle rancher.
1 ¡Littleton correctly states that there is no Louisiana jurisprudence dealing with the liability of an auctioneer for the sale of *543 stolen property. The general principles of the law of agency and of torts in other jurisdictions, however, provide some guidance:
An agent who does acts which would otherwise constitute trespass to or conversion of chattel is not relieved of liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession of the chattels.
Restatement of Agency Second, § 349 (1984).
[O]ne who, as agent or servant, of a third person disposes of a chattel to one not entitled to its immediate possession in consummation of a transaction negotiated by the agent or servant is subject to liability for conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel.
Restatement of Torts Second, § 233 (1986).
Littleton argues that under these principles, the law of other jurisdictions provides that an auctioneer who sells property on behalf of a principal having no title thereto is personally liable to the true owner for conversion, regardless of whether he had notice of the true owner’s title, or whether he acted with the utmost good faith in total ignorance thereof, provided, however, that the true owner has not by his or her own act or assent given a color of title or an apparent right of sale to the party for whom the auctioneer acts. See 7 Am. Jur.2d, Auctions and Auctioneers, § 85; Liability of Servant to Third Person, 20 A.L.R. 97 at 135 (1922). See also United States v. Carson, 372 F.2d 429 (6 th Cir.1967); First National Bank of Amarillo v. Southwestern Livestock, Inc., 859 F.2d 847 (10th Cir.1988); United States v. Midwest Livestock Producers Cooperative, 493 F.Supp. 1001 (E.D.Wis.1980); United States v. LaGrange Stockyard, Inc., 270 F.Supp. 492 (N.D.Ga.1967); United States v. Sommerville, 211 F.Supp. 843 (W.D.Pa.1962), affirmed 324 F.2d 712 (3d Cir.1963), cert. denied 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.L2d 608 (1964). Historically, other jurisdictions have found an auctioneer liable if he has custody of the movable and then sells it to another.
Although the issue has never been addressed in this state, there is some jurisprudential indication that the rule discussed above and well settled in other jurisdictions is also applicable in Louisiana. In Southeast Equipment Company, Inc. v. Office of State Police, Troop B, 437 So.2d 1184 (La.App. 4 th Cir.1983), plaintiff purchased a piece of heavy equipment from a dealer. The equipment was stolen. The true owner sought to recover it and the plaintiff, an innocent purchaser, filed a mandamus action against the state police who had impounded the equipment. It was decided in that case that the true owner of the equipment could recover it from the plaintiff who purchased it in good faith, upon reimbursement of the purchase price, in accordance with La. C.C. art. 524. However, it was also suggested that the true owner might have recourse against the dealer who sold the property as agent for a principal who was not the true owner.
The first three sales of Littleton’s cows were made by Smith through the auction house, LPI. To determine LPI’s liability, we must discern its relationship with Smith. Under the facts of this case, we do not find that LPI and Stratton, acting for LPI, were guilty of any intentional wrong or complicity with Smith in the sale of the stolen cattle. The relationship between the livestock dealer, the seller and the bidder (purchaser) is in the nature of a dual agency. Tyler v. Elston, 236 So.2d 658 (La.App. 2d Cir.1970). LPI was an agent acting for Smith, a dishonest principal. Smith was not a regular customer of the business, the cattlé had fresh brands not associated with Smith, and LPI and Stratton made no inquiry into the ownership of the cattle. Under these circumstances, we find that LPI is liable to Littleton for the price of the 126 cows sold *544 at auction, $94,500. The trial court was manifestly erroneous or clearly wrong in holding otherwise.
J^LITTLETON’S LIABILITY
Littleton asserts that the trial court erred in finding him to be at fault in this case. He complains that the trial court assessed him with 30% fault for allowing the cows to remain in Bossier Parish for a long time without adequately securing them. Littleton argues that the original agreement with Smith, when the cows were purchased, called for the cows to remain in Bossier Parish until November 1, 1994. When the cows began calving early, he made a separate contract with Smith to allow the cows to remain until late February 1995. Littleton paid $11,000 to allow the cows to remain the additional time.[3] He contends that it was reasonable to assume that the cows were secure and that he was not required to assume that Smith was a thief.
In the present case, we find that the trial court was clearly wrong and manifestly erroneous in finding that Littleton was liable in any way for the theft of his own property. The trial court based this determination on a finding that Littleton left the cows in Bossier Parish for an extended period of time without adequately securing them. The record fails to support that this action by Littleton was negligent or unreasonable in any way.
Littleton had an agreement with Smith to pasture the cows at the Shady Grove farm until they were finished calving and could be moved to his farm in Texas. According to Littleton’s testimony, the cattle had to be tested for brucellosis before they could be moved and frequently a pregnant cow will render a false positive on this test. Smith suggested that the cows be left at Shady Grove from November 1, 1994 until February 28, 1995. They agreed upon the price of $11,000 for pasturing the cows. Littleton claims that at the time this agreement was made, he had no indication that Smith was a dishonest person who would not h;,abide by the agreement and would steal the cattle. Under the facts, Littleton took action that appeared to be reasonable in securing the cows during the winter, while their calves were being born. There is nothing in the record to support the trial court’s finding that Littleton was at fault in any way or that he contributed to the theft of his cows. Accordingly, this finding by the trial court is manifestly erroneous and clearly wrong and is reversed.
GOOD FAITH PURCHASER
Following the sale at auction of 126 cows, Stratton, in his personal capacity, purchased the remaining 74 cows and was reimbursed by LPI. Littleton argues that Stratton and/or LPI were not good faith purchasers and the trial court erred in ordering that Littleton reimburse LPI and/or Stratton the purchase price of the 74 cows, $53,650.
LPI argues that not only was it entitled to reimbursement for this amount, but the trial court should have ordered that Little-ton make reimbursement for this amount before the remaining cows in Sonnier’s care were returned to Littleton. According to LPI, it was a good faith purchaser when the 74 cows were purchased from Smith in January 1995 and, under La. C.C. art. 524, it is entitled to recover the purchase price.
La. C.C. art. 524 provides in pertinent part:
The owner of a lost or stolen movable may recover it from a possessor who bought it in good faith at a public auction or from a merchant customarily selling similar things on reimbursing the purchase price.
La. C.C. art 523 provides that an acquirer of a corporeal movable is in good faith *545 unless he knows, or should have known, that the transferor was not the owner. If the purchaser knows that the object is stolen prior to purchasing it, there is no good faith. But, where actual knowledge is absent, the article imputes knowledge if the | ¶¡¡purchaser has access to facts, which would lead a prudent man to question the ownership of his vendor. Brown and Root, Inc., v. Southeast Equipment Company, Inc., 470 So.2d 516 (La.App. 1st Cir.1985). In Brown and Root, Inc., the purchaser of equipment from a dealer was found to be in good faith even though the serial number on the piece of equipment had been tampered with and the price was low. The facts showed that the tampering was concealed, the purchase was made from an equipment dealer and other equipment was for sale at the establishment at similar or lower prices.
We find that the facts of the present case are distinguishable from those in Brown and Root, Inc. Regarding the purchase of the 74 cows, Stratton and/or LPI were not in good faith, as that term is construed under the provisions discussed above. Stratton had sufficient notice that something was amiss when Smith sought to quickly consummate a private sale of cattle that had a new brand that was not attributable to Smith or any of the concerns with which he was associated. According to Littleton, his “BL” brand was registered in Texas. Stratton testified that the brand on the cattle was referenced in a Louisiana brand book and determined to belong to a farmer in Coushat-ta with no connection to Smith, Glasscock or the McDade operation. Even though the brand actually belonged to Littleton and was registered in Texas, not only did Stratton fail to check the brand registry in neighboring states, but when the brand did not seem to fit with Smith, he made no further inquiry. Given the freshness of the brand, Stratton should have at least questioned the ownership of the cattle. Smith was pressing for a quick, private sale of the last of the cows from the herd. Stratton moved forward to purchase the cows and immediately resell them for a quick profit. Therefore, we find that, limited to the facts presented herein, and as construed under La. C.C. art. 523 et seq., Stratton and/ or LPI were not in. good faith in purchasing the 74 cows, [14and are not entitled to reimbursement from Little-ton for the purchase price of those cows. However, LPI may recover the amount paid from Smith, who knowingly sold property that he did not own.
GLASSCOCK’S LIABILITY FOR SMITH’S ACTS
Littleton argues that Glasscock should be liable for the full amount of Littleton’s loss under the principles of partnership and agency. Glasscock argues that the trial court erred in finding that he is liable to either Littleton or to Stratton and LPI for the actions of Smith.
The trial court found that Glasscock was liable to Littleton and to Stratton for the actions of Smith, reasoning that Glasscock knew or should have known that Danny Smith was openly portraying to others that he had the authority to buy and sell cattle for the Glasscock/Smith partnership. According to Littleton, the trial court was correct in this finding. Glasscock admitted being in business with Smith. Glas-scock put up the money and Smith would find cows to buy, take care of them and then resell them. The men would then split the profits. Glasscock did not consider Smith an employee. Glasscock was concerned when Smith asked Littleton for two checks, one payable to Smith. However, Glasscock did nothing about Smith’s actions. Littleton argues that Smith and Glasscock were either partners or Smith was an agent for Glasscock and therefore Glasscock should be liable for the full amount of the loss caused by Smith.
Glasscock argues that the trial court erred in finding him liable for the actions of Smith. He contends that Littleton purchased the 200 cows in a sale negotiated by Danny Smith. Even though Smith re *546 quested two checks, one payable to him, Glasscock received full payment for the cows. Glasscock asserts that because the sale with Littleton was completed, he saw no need to point out to Littleton the inaccuracy of Smith’s representations that Smith owned the cows |1Bwith Glasscock. After the sale, Littleton chose to leave the cows at the Shady Grove farm and negotiated solely with Smith to care for the cows. Glasscock contends that neither he nor his family received any benefit from that agreement. He also argues that it was solely the dealing between Littleton and Smith which allowed the cattle to remain in the possession of Smith.
He further contends that when Smith began selling the cows at LPI, the sales were made for Smith Farms and in no way was there any indication that Glasscock was involved in that sale or that Smith was acting on behalf of Glasscock. Glasscock, who lives in Houston, asserts that there is no way he could have known or should have known what Smith was doing. He contends that the greater fault lies, with LPI and Stratton, in that Stratton should have made some inquiry when Smith tried to sell hundreds of cows with the “BL” brand and new, sequentially numbered ear tags. He contends that if Stratton had called him and inquired about Smith and the cows, this entire situation could have been avoided.
In analyzing these arguments, we must first classify the relationship between Smith and Glasscock. The record is clear that Smith had a written partnership agreement with McDade Cattle Company, fully setting forth the parameters of the relationship. However, the transactions at issue here concern the separate business relationship between Smith and Glasscock and do not concern the McDade Cattle Company.
This court finds that the business relationship between Glasscock and Smith, as it pertains to the Shady Grove venture, had ended by the time Smith fraudulently sold Littleton’s cows. Smith’s conversion of the cows occurred while Littleton was merely leasing pastureland from Smith. Glasscock’s family owned the Shady Grove property, but leased it to Smith. Consequently, Glasscock’s position after the sale was only as one of several lessors of the property to Smith. |1fiAny enterprise Glas-scock and Smith may have previously engaged in for the buying and selling of these particular cows was concluded by that time. After the sale of the cows to Littleton, he paid Smith alone for keeping his cows at Shady Grove. Further, there is nothing in the record to indicate that Littleton perceived that Glasscock was in any way involved with the agreement with Smith to board the cattle. Certainly, had the conversion occurred prior to the lease agreement between Littleton and Smith, it would be necessary to scrutinize the relationship between Glasscock and Smith to determine possible liability on the part of Glasscock. However, under the facts presented, the conversion took place when Glasscock did not have any relationship with Smith that would render him liable to Littleton.
Likewise, Glasscock has no liability to LPI or Stratton. Stratton knew that Smith raised his own cattle in addition to performing some work for the Glasscocks. All the money received by Smith for the sale of the cows was payable to him or his company, except the $6,000 check Smith directed be made to McDade Farms. We also note that this check was made payable to McDade Farms and not to Glasscock alone. In the trial court no judgment was rendered against McDade Farms and that finding has not been controverted on appeal. Therefore, as discussed above, at the time of Smith’s wrongdoing, Glasscock had no relationship with Smith that would make him liable for the sale of these cows. Neither LPI nor Stratton has a basis upon which to recover from Glasscock.
KEEPER’S FEE
Littleton claims that the amount awarded to Sonnier for keeping the 74 cows was *547 excessive and should not have been paid from the proceeds of the sale of the calves. According to Mr. Littleton, the trial court in effect awarded Sonnier more than $41,-000, an amount much higher than the usual fee for pasturing cattle | ^established in the record. He argues that, in claiming a high keeper’s fee, Sonnier presented proof showing that, for the years he actually kept the cows in question, his expenses were lower than the previous year. Little-ton contends that Sonnier claimed as expenses insurance, gas and labor, items which he would have had to pay even if he had not kept.Littleton’s cows.
Littleton also claims the trial court erred in ruling that the keeper’s fee due Sonnier be paid out of the proceeds of the sale of the calves belonging to Littleton. He contends that he should not have been assessed with the keeper’s fee, but rather that it should have been assessed against Stratton, LPI, and Glasscock.
Don Sonnier appealed the trial court judgment contending that the keeper’s fee awarded to him was excessively low. He argues that due to a seizure and injunction involving the cows, the parties agreed that the cows should remain on Sonnier’s property. The cows were seized on or about February 23, 1995 and remained on Sonnier’s farm until October 25, 1997. Sonnier contended he was entitled to expenses for keeping the cows for approximately two and one-half years. Sonnier claims that under the concepts of bailment, negotio-rwn gestio, and unjust enrichment, he is entitled to recovery for keeping the cows. Sonnier claims he proved that he spent $256.52 per cow in 1995, $267.71 in 1996 and $367.62 in 1997. According to Sonnier, his actual expenses for keeping these cows for two and one-half years were $81,-642.26.[4] He asserts he should be awarded this amount which would only reimburse him for his out-of-pocket expenses in keeping the cows. Sonnier contends that Lit-tleton is the proper party to pay for the care given the cows because they belong to him and Sonnier’s efforts enured to Little-ton’s benefit. He further contends that Littleton should be |1sjointly liable with LPI and Stratton because those parties entered into a consent judgment specifying that the cows be left with Sonnier.
It is not disputed that Sonnier was required to keep the cattle by virtue of a court order and an agreement with the parties and that he is entitled to recover for his expenses. The issues for decision are the amount to be recovered and the party or parties responsible for payment. At trial, Sonnier introduced the testimony of Kenneth Paxton, professor of Ag-Economics and Ag-Business at Louisiana State University in Baton Rouge. According to Professor Paxton, statistics collected by his department show that the annual cost for raising cow/calf units in 1996 was $417.88 per unit and $600 per unit per year in 1997. However, Professor Paxton stated that he would defer to the opinion of someone who actually rents pasture over his survey results. In Sonnier’s brief, he concedes that Professor Paxton’s estimation of the expense of keeping the cows includes some dubious items such as barns, water lines, utilities and tractors.
We find that the trial court did not commit manifest error in its determination that Sonnier was entitled to the proceeds of the sale of the calves. The trial court had evidence upon which it could reasonably base this award, and thus, was not clearly wrong. The award of the certificate of deposit, composed of $39,000 and interest,'to Sonnier and against Littleton, is affirmed.
The trial court found that the keeper’s, fee was to be paid by Mr. Little-ton, because he was ultimately determined to be the owner of the cows and Sonnier’s efforts in caring for the cows enured to *548 Littleton’s benefit. Further, Littleton entered into an agreement with the other parties in this ease allowing the cows to remain with Sonnier during a portion of the time this matter was pending. However, we note that Sonnier would not have kept the cows for an extended period of time, were it not for the actions of Smith in stealing the cows. Therefore |19we find that, while Littleton is liable to Sonnier for the keeper’s fee, Littleton is also entitled to recover the keeper’s fee from Smith.
COMPARATIVE FAULT
LPI and Ronnie Stratton argue that the trial court erred in applying the principles of comparative fault, when this affirmative defense was not pled by any of the parties. They argue that this doctrine must be asserted so as to provide fair notice and to prevent surprise. They claim that the trial court did not advise that it was considering the application of principles of comparative fault. If they had received such notice, they would have put on evidence to show that they acted in conformity with generally accepted practices in the livestock barn industry.
We agree that the trial court erred in applying the principles of comparative fault to this case. Comparative fault is governed by La. C.C. art. 2328 which provides:
A.In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tort-feasor, his claim for recovery of damages shall not be reduced.
LoNone of the parties in this case pled or argued the principles of comparative fault. See La. C.C.P. art. 1005. Further, we find that the application of this doctrine in this case is simply not necessary to the decision of this case. We find that Littleton was not at fault and that LPI is liable with Smith through principles of agency as discussed above.
CONCLUSION
We find that all of the losses in this case stem from the actions of Danny Smith. Although he is solidarily liable with some parties in this case, Smith is solely liable for those losses to all parties aggrieved in this case. To further summarize, the findings of this court are as follows:
(1) LPI as auctioneer was liable for the sale of the 126 cows for a principal who did not own them. Therefore, LPI is solidarily liable with Smith to Littleton for $94,500 (126 cows X $750) paid by Littleton. The trial court judgment to the contrary is reversed. However, LPI is entitled to recover this entire amount from Smith.
(2) Littleton was not at fault in this matter and no part of his recovery is reduced by comparative fault. The trial court judgment to the contrary is reversed.
*549 (3) Neither Stratton nor LPI were good faith purchasers of the 74 cows and are not entitled to recover the purchase price from Littleton under La. C.C. art. 524. The trial court judgment to the contrary is reversed. However, LPI is entitled to recover solely from Smith the amount it paid Smith for the 74 cows, $53,650.
(4) Glasscock is not liable for Smith’s actions. The trial court judgment to the contrary is reversed.
(5) Sonnier is entitled to a keeper’s fee for earing for the 74 cows for 32 months. We find no error in the trial court judgment awarding to Sonnier the $39,000 certificate of deposit on deposit with the court, together with interest accruing thereto, representing the proceeds from the sale of calves belonging to Littleton. We further find that Littleton is liable to Sonnier in solido with Smith for this amount. Littleton is entitled to recover this amount from Smith.
(6) We find that principles of comparative fault are not applicable to this case. The trial court judgment to the contrary is reversed.
| ^DECREE
IT IS ORDERED ADJUDGED AND DECREED that there be judgment as follows:
(1) In favor of B.L. LITTLETON and against DANNY SMITH D/B/A SMITH FARMS and LIVESTOCK PRODUCERS, INC., in solido, ninety-four thousand five hundred dollars ($94,500) together with legal interest from February 23, 1995;
(2) In favor of B.L. LITTLETON, and against DANNY SMITH D/B/A SMITH FARMS, $39,000 plus interest accrued to a certificate of deposit on deposit with the court, representing the proceeds of the sale of Littleton’s calves by Sonnier, together with legal interest from May 8, 1997;
(3) In favor of B.L. LITTLETON, ownership of the cows remaining in the care of DON SONNIER;
(4) In favor of DON SONNIER and against B.L. LITTLETON and DANNY SMITH D/B/A SMITH FARMS, in soli-do, a certificate of deposit in the amount of thirty-nine thousand dollars ($39,000), plus interest accrued thereto, on deposit with the court, representing the proceeds of the sale of Littleton’s calves by Sonnier, together with legal interest from May 8, 1997;
(5) In favor of LIVESTOCK PRODUCERS, INC. and against DANNY SMITH D/B/A SMITH FARMS, fifty-three thousand six hundred fifty dollars ($53,650), representing the price conveyed to Smith for purchase of the remaining 74 cows belonging to Littleton, as well as ninety-four thousand five hundred dollars ($94,500), representing the 126 cows sold at auction.
All costs in this court and in the court below áre to be assessed evenly between LIVESTOCK PRODUCERS, INC., and DANNY SMITH D/B/A SMITH FARMS.
REVERSED IN PART; AFFIRMED IN PART; RENDERED.
APPLICATION FOR REHEARING
Before NORRIS, C.J., WILLIAMS, STEWART, GASKINS, and KOSTELKA, JJ.
Rehearing Denied.

. See discussion of Veazey and subsequent legislation in Morrison v. Kappa Alpha PSI Fraternity, 31, 805 (La.App.2d Cir.5/7/99), 738 So.2d 1105, holding that amendments for Civil Code articles on comparative fault are procedural and are to be applied retroactively.

. No judgment was assessed against the McDade Cattle Company and none of the parties have objected to that finding on appeal.

. The trial court judgment made no award to Littleton for the $11,000 pasturage fee paid to Smith and Littleton has not argued on appeal that the trial court erred in this regard.

. However, we note that Sonnier only paid a little over $61,000 in his attempt to purchase the cows in early 1995.